**In re Guiseppe Enzo CECCONI, Debtor.**

**Sarah Cecconi, Plaintiff,**

v.

**Guiseppe Enzo Cecconi, A.C. Spicer, Trustee in Bankruptcy (under U.K. insolvency laws), Defendants.**

**A.C. Spicer, Trustee in Bankruptcy (under U.K. insolvency laws), Counter–Claimant,**

v.

**Sarah Cecconi, Counter–Defendant.**

**A.C. Spicer, Trustee in Bankruptcy (under U.K. insolvency laws), Cross–Complainant,**

v.

**Guiseppe Enzo Cecconi, Cross–Defendant.**

**Bankruptcy No. 02–50653–ASW. Adversary No. 03–5024.**

United States Bankruptcy Court, N.D. California.

April 17, 2007.

Patric J. Kelly, Adleson, Hess and Kelly, Campbell, CA, for Giuseppe Enzo Cecconi.

Elaine M. Seid, McPharlin, Sprinkles & Thomas, San Jose, CA, for Sarah Cecconi.

Amy L. Hespenheide, Shartsis, Friese & Ginsburg, San Francisco, CA, for A.C. Spicer.

## MEMORANDUM DECISION AFTER TRIAL

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is Plaintiff Sarah Cecconi's ("Sarah")[1] complaint against Giuseppe Enzo Cecconi ("Enzo") and A.C. Spicer, Trustee in Bankruptcy (under U.K. Insolvency Laws) ("Trustee") and Trustee's related counterclaim and cross-claim. Sarah seeks a determination that the house and property located at 3190 Del Ciervo Drive, Pebble Beach, California (the "Property") are her sole and separate property. Trustee seeks a determination that Enzo holds a community property interest in the Property.

---

1. The Court will refer to Mr. and Mrs. Cecconi by their first names—as the Cecconis' counsel did in the joint post-trial briefs—for the sake of clarity, and means no disrespect in so doing.

The matter has been tried and submitted for decision. Sarah is represented by Paul S. Avila, Esq. and Elaine M. Seid, Esq. of McPharlin, Sprinkles & Thomas LLP. Enzo is represented by Patric J. Kelly, Esq. of Adleson, Hess & Kelly. Trustee is represented by Mary Jo Shartsis, Esq. and Amy L. Hespenheide, Esq. of Shartsis, Friese & Ginsburg LLP. At trial Sarah called Enzo, Carla Korb, Gary Vandeweghe, Elizabeth Montagu, Jane Watson Steel, Elaine Seid and herself as witnesses. Trustee called Enzo and himself as witnesses.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

This case involves an unusual couple with an unusual lifestyle. Sarah and Enzo are both in their 70s and have been married for over 30 years. In the early years of their marriage, the Cecconis acted as many married couples do—*i.e.*, they lived together. At that point they lived in Venice, Italy at or near the Hotel Cipriani ("Cipriani") where Enzo worked as a general manager. The couple lived on Enzo's income. For the next twenty-two years, however, Enzo and Sarah maintained a strong marriage while pursuing very separate and independent lifestyles. Their separate finances were a key aspect of their relationship. About the same time Enzo decided to leave Venice and open up a restaurant in London, Sarah inherited a large portfolio of stock and oil royalties from her grandmother. Sarah did not want to live in London full-time and the couple started to live separate lives. Enzo primarily ran a restaurant in London and Sarah spent her time traveling with her mother, summering in Venice, Italy and wintering in Pebble Beach, California. Enzo and Sarah spent time with each other during the spring and fall, and saw each other on occasion during the summer and winter months.

The couple had a mutual, clear and strong understanding that Enzo's property from his business ventures were his and Sarah's inheritance was hers. Enzo and Sarah maintained separate finances and each provided for their own living expenses. The couple clearly understood and agreed that Enzo had his property in Europe and Sarah had her property in the United States, and they acted separately with regard to that property—Enzo ran his restaurants and renovated property in London without input from Sarah. Sarah purchased a townhouse in Pebble Beach and purchased and constructed the Property without input from Enzo. It is due in large part to the unusual nature of their relationship that Sarah is able to support her position so convincingly as the plaintiff in this lawsuit.

### A. Procedural Background

Enzo ran into financial difficulties in the 1990s. Insolvency proceedings were ordered against him in the United Kingdom on January 8, 2001. Trustee filed an ancillary proceeding under 11 U.S.C. § 304 in this Court on January 7, 2002. On January 15, 2003, Sarah filed a Complaint to Establish Purchase Money Resulting Trust against Enzo and Trustee. On February 21, 2003, Trustee filed his answer, counterclaim and cross-claim. Trustee amended his counterclaim and cross-claim on March 27, 2003, and June 18, 2003. Trial commenced on this matter on March 21, 2005 and continued on March 22, 23, 24, 28, 29, 30, and 31, 2005; April 1, 8, 12, 13, 25, and 26, 2005; and May 31, 2005. Post-trial briefing ended on November 22, 2006.

## B. Witnesses

i.) Enzo Cecconi—Enzo is a citizen and resident of Italy and a debtor in insolvency proceedings in the United Kingdom.

ii.) Sarah Cecconi—Sarah is the wife of Enzo.

iii.) Carla Korb—Ms. Korb was the business and social secretary to Sarah's father, George Coleman, from August 1976 to February 1998.

iv.) Gary Vandeweghe—Mr. Vandeweghe is an attorney and a friend of both of Sarah's parents. Mr. Vandeweghe also represented Sarah in relation to litigation over the Property filed by the Royal Bank of Scotland.

v.) Elizabeth Montagu—Mrs. Montagu is Sarah's mother and the Dowager Duchess of Manchester ("Duchess").

vi.) Jane Watson Steel—Ms. Steel is Sarah's friend.

vii.) Elaine Seid—Ms. Seid is an attorney and represents Sarah in this litigation.

viii.) Trustee A.C. Spicer—Trustee is a chartered accountant and the trustee in Enzo's insolvency proceedings in the United Kingdom.

## C. Pre–Marriage Background

*Enzo*

Enzo was born and raised in Venice, Italy where he attended private school and gymnasium. Enzo wanted to work in the hotel and restaurant business since childhood, and started in that industry in 1956 when he was 20 years old. Enzo joined the Bauer Hotel, a deluxe hotel in Venice, in 1957. In order to improve himself, Enzo worked at the Bauer during the summer, then, during the winter months, he traveled to Germany, France, and London, among other places, to work and study seeking to develop his language skills so he could write a proper letter in English,

French or German. Enzo speaks Italian, English, French, German and Spanish. In 1964, Enzo joined the Cipriani in Venice as an assistant manager and worked his way up to general manager of the hotel sometime prior to 1973. The Cipriani is a highend hotel and caters to well-to-do guests. It is currently one of the top ten hotels in the world.

*Sarah*

Sarah was born in Miami, Oklahoma to George and Elizabeth Coleman. Sarah comes from a very wealthy family—her father was on the board of directors for Pennzoil—and she has lived an unusual life. During Sarah's childhood, she spent the summers in Pebble Beach, California and the winters in Florida. Sarah started attending boarding school in Wellesley, Massachusetts around eleven years of age and spent the first three years of high school in Middleburg, Virginia. During these years, Sarah spent the summers in Pebble Beach. Sarah spent her senior year of high school in Pebble Beach and graduated from a private high school in Monterey. Sarah developed an affinity for Pebble Beach during her childhood.

Sarah's parents divorced in 1957 or 1958 and, after that time, Sarah's mother, the Duchess, resided in Pebble Beach and Mr. Coleman resided in Palm Beach, Florida. Around this time, Sarah moved to Los Angeles and worked at two different jobs for a total of approximately one year—her only employment in her life. Mr. Coleman paid the rent on Sarah's apartments in Los Angeles.

After the Duchess divorced Mr. Coleman, the Duchess married William Crocker and, after Mr. Crocker died, the Duchess married the Duke of Manchester. During most of the 1960s, and until Sarah married Enzo, Sarah traveled with the Duchess and lived in several places during

the year. Sarah spent approximately four months a year in Pebble Beach, two or three months in New York City, three months in London, and some time in Kenya where the Duke of Manchester had property.

At this point in her life, Sarah did not have much income and received only a small monthly allowance. Sarah did own a townhouse in Sun Valley, Idaho ("Sun Valley Property") for approximately five years in the late 1960s and early 1970s. When Sarah owned the Sun Valley Property, she spent approximately five months a year in Sun Valley. To purchase the Sun Valley Property, Sarah borrowed $60,000 from a trust set up by Mr. Coleman's mother and father ("Trust"). The Trust was comprised of a wealthy stock portfolio and oil royalties. Mr. Coleman was trustee for and managed the Trust for his mother. The funds Sarah borrowed were repaid to the Trust when the Sun Valley Property was sold.

*Enzo and Sarah*

Enzo first met Sarah at the Cipriani in 1973 when Sarah stayed at the hotel with the Duke and Duchess of Manchester. Enzo and Sarah married in May 1974. At the time he married, Enzo owned a car, was the general manager of the Cipriani, and had a small house in the country for his parents. When Sarah married Enzo, Mr. Coleman cut off Sarah's monthly allowance. The Cecconis lived at the Cipriani during their first year of marriage since part of Enzo's salary included an apartment inside the hotel. For the next three years, the Cecconis leased the apartment next door to the hotel, with the Cipriani paying the rent and all expenses of that apartment.

For most of the time Enzo was employed at the Cipriani, the Guinness family owned the hotel. At some point, the Cipriani was sold by the Guinness family and the new owner asked Enzo to remain as a director of the new company. But Enzo was ready to move on in his life and, in 1978, Enzo resigned from the Cipriani to open a restaurant in London.

## D. Enzo's Businesses

Enzo opened Cecconi's restaurant in 1978. Cecconi's was an upper-end restaurant in the Mayfair district of London—the district where the best shops and art dealers are located. Enzo testified that he chose to open his restaurant in London because he knew thousands of people there, mostly through his employment at the Cipriani. Enzo decided to open a restaurant rather than a hotel because he needed only a small investment for a restaurant and would have needed much more money to open a hotel. The Duchess guaranteed a $200,000 loan taken out by Enzo from the Bessemer Trust—a firm that handled the Duchess' financial affairs—to start the restaurant. Of the $200,000, $187,250 was distributed to Enzo Holdings B.V. and $12,750 to Enzo.

Enzo's relationship with the Royal Bank of Scotland ("Bank") also started in 1978. Enzo was introduced to the Bank by Lord Boyd of Merton of the Guinness family. The Bank had a branch office across the street from the London restaurant and Enzo would stop by that branch office on a daily basis. Enzo had a close relationship with the Bank's branch manager during the 1980s. Periodically the branch manager invited Enzo to lunch or they shared some whiskey. The daily relationship continued until the branch was closed in the early 1990s.

Enzo had three different accounts with the Bank—two business accounts and a personal account. Enzo maintained an overdraft or credit facility on each of these accounts. The credit facility permitted Enzo to draw on a line of credit as needed.

Although Sarah was a signatory on the checking portion of the personal account with the Bank, both Enzo and Sarah testified that Sarah did not use that account. There is no evidence that Sarah agreed to be liable for the credit facility on the personal account. The London restaurant used its credit facility for only two or three months because it made enough money early on to cover the expenses. Enzo did not recall telling anyone at the Bank in 1978 that he had borrowed $200,000, guaranteed by the Duchess, to start the London restaurant.

Cecconi Restauranteurs Limited ("CRL") owned the London restaurant. Enzo originally owned an 80 percent interest in CRL. The other 20 percent was owned by another Venetian, John Carlos Fabris, with whom Enzo worked at the Cipriani. Enzo bought out Mr. Fabris' interest in 1985 and had sole ownership of CRL thereafter. Sarah never held any interest in CRL. Enzo did not consult Sarah regarding any business decisions for the London restaurant.

One year after opening the London restaurant Enzo opened a "Cecconi's" restaurant in Paris. The Paris restaurant was financed by Pierre Gruet—the owner of the Venice apartment that Enzo leased when Enzo worked at the Cipriani—and a good customer of the Cipriani. Mr. Gruet agreed to finance the Paris restaurant until Enzo could pay Mr. Gruet back. Enzo did not consult Sarah regarding any business decisions for the Paris restaurant. Sarah testified that she first learned about the Paris restaurant from her next-door neighbor in Venice.

In addition to operating the London and Paris restaurants, Enzo had other income-producing pursuits. Enzo granted the right to open franchise restaurants in Istanbul, Turkey and Ocho Rios, Jamaica. Enzo also was a consultant for the Italian line of food at the department store Marks & Spencer and a consultant for British Airways to improve the food on the first class international routes. Enzo and Sarah both testified that they considered Enzo's interests in his businesses to be only Enzo's property.

## E. Post–1978 Marriage

Sarah initially came to London with Enzo in the autumn of 1978 when Enzo started his restaurant, but Sarah did not want to live in London on a full-time basis. Sarah returned to a version of her pre-marriage lifestyle and the Cecconis entered into a type of "commuting marriage" from 1978 through 2000. In the winter, Sarah would travel to Pebble Beach, California with her mother and, in the spring, Sarah would travel through London on her way to Venice where Sarah would spend the summer.[2] Sarah would spend one to two months living with Enzo in London each fall and spring. When Enzo had the Paris restaurant, Sarah would spend the month of May with him in Paris.

When Sarah spent the summer in Venice, Enzo would take long weekends and travel to Venice by car or plane to spend time with her. Enzo was able to take such long weekends in July and August because his restaurants were slow on those days since his customers would spend time at their country homes from Thursday to Sunday. When Sarah was at Pebble Beach, Enzo spent about ten days during Christmas and New Year's and about two weeks at Easter with her. Periodically, if Enzo had to travel to Los Angeles for his

---

2. Enzo paid the rent on the Venice property— where the Cecconis had lived while Enzo worked at the Cipriani—for a few years after Enzo moved to London. The Duchess took over that lease in 1980 or 1981.

consulting engagement with British Airways, he would make an excursion to Pebble Beach to spend a few days with Sarah.

## F. The Inheritance

In 1979, Sarah's paternal grandmother passed away and Sarah inherited one-third of the Trust in 1980. Sarah was able to live comfortably on the income from the stock portfolio and oil royalties. Eioth Enzo and Sarah testified that Sarah's inheritance was her money and her money alone and Enzo had no interest in it. Enzo testified that his belief is based in part on Italian law where the wife retains all of her property as her own.

Mr. Coleman offered to manage the Trust inheritance for Sarah and Sarah agreed. From the time Sarah received her inheritance share of the Trust until his death in 1997, Mr. Coleman managed and directed Sarah's finances for her with the assistance of professional lawyers, accountants and financial advisors. Mr. Coleman managed Sarah's finances from his business office in Florida. Ms. Korb was Mr. Coleman's business and social secretary from August 1976 until Mr. Coleman's death in July 1997. Ms. Korb remained at Mr. Coleman's Florida office until February 1998 to close up the office. In her capacity as Mr. Coleman's business and social secretary, Ms. Korb handled Mr. Coleman's books and contacted the various professional advisors with whom Mr. Coleman did business. Ms. Korb also maintained Sarah's financial records from 1980 through February 1998. Mr. Coleman had a power of attorney on behalf of Sarah. Mr. Coleman and/or Ms. Korb routinely completed whatever paperwork was needed to manage Sarah's financial affairs.

Since Mr. Coleman and Ms. Korb managed the details of Sarah's finances, Sarah did not have to and did not in fact pay particular attention to the details of her finances. Rather, Sarah spent most of her time traveling overseas. When Sarah needed spending money, Mr. Coleman and/or Ms. Korb would make the necessary arrangements with the appropriate bank or brokerage house on behalf of Sarah such as liquidating stocks or obtaining loans secured by Sarah's stocks. Mr. Coleman and/or Ms. Korb would arrange for documents to be delivered to Sarah wherever she was so that Sarah could sign whatever documents required her signature. Sarah unconditionally trusted Mr. Coleman and Ms. Korb with her finances.

Mr. Coleman tried to advance Sarah's interest in managing her finances and had Sarah's best interests at heart. For example, if Sarah needed additional monies beyond her monthly dividends and royalties, Mr. Coleman preferred to have Sarah borrow funds from the First National Bank in Palm Beach, Florida ("Florida Bank") rather than liquidate her stock portfolio. This was because Sarah had a low basis in her stocks and liquidating the stocks caused Sarah to incur large capital gains taxes. The loans from the Florida Bank were secured by Sarah's shares of stock. In 1983, Mr. Coleman also recommended that Sarah establish a trust for estate planning purposes and to protect Sarah's assets. The Sarah C. Cecconi Trust was established in March 1984.

During the period when Mr. Coleman managed Sarah's financial affairs, Sarah did not reconcile her own checking account. Rather, Ms. Korb prepared monthly reports that showed the account balance for Sarah's checking account with the Florida Bank ("Florida Bank Account") as of the end of each month, and a list of the deposits and checks drawn for the monthly period covered by the statement. Starting in 1987, the monthly statements also included the current value of Sarah's portfolio and the cost basis. The monthly re-

ports were prepared in the first few days of the following month and were sent to Sarah shortly after preparation. Sarah did not share these statements with Enzo and did not ask Enzo for financial advice.

Enzo and Sarah did not own any property together. Enzo and Sarah were both named on accounts each had at Wells Fargo Bank in Pebble Beach, but Sarah did not use Enzo's account and Enzo did not use Sarah's account. Enzo is not named on any brokerage account held by Sarah. Both Enzo and Sarah believed that Enzo's property was his and Sarah's property was hers. Although there is no written document setting forth this agreement, Enzo and Sarah both credibly testified to this mutual agreement. It is the clear understanding of both Enzo and Sarah that they had this mutual agreement. Enzo and Sarah always file separate tax returns.

### G. Loans by Sarah to Enzo

After Sarah inherited her portion of the Trust, the Duchess requested that the $200,000 loan guaranteed by the Duchess be paid off to permit the collateral securing the loan to be used in another fashion. On January 26, 1981, Enzo and Sarah signed a. $200,000 demand note ("$200,000 Note") with Florida Bank. The initial annual interest rate on the $200,000 Note was 18%. The $200,000 was used to retire the guaranteed debt with Bessemer Trust and was secured by shares of Sarah's stock. Enzo and Sarah both understood that Enzo would pay the interest on the $200,000 Note and Enzo would be solely responsible for paying the interest and paying off the principal. Both Enzo and Sarah testified that this was not an investment in the restaurant, but a loan without a maturation date.

In 1982, the Communist Party won the French national elections and immediately nationalized the banks. Mr. Gruet fled France and moved to Paraguay. Enzo quickly paid the amounts owed Mr. Gruet through the assistance of friends and Sarah. Enzo also took on a 25 percent partner whom Enzo later bought out. On January 1, 1982, Enzo and Sarah signed a $100,000 demand note ("$100,000 Note") with the Florida Bank. The initial annual interest rate on the $100,000 Note was 15.75%. The $100,000 was used to pay off Mr. Gruet and was secured by shares of Sarah's stock. Enzo and Sarah both understood that Enzo would pay the interest on the $100,000 Note and Enzo would be solely responsible for paying the interest and paying off the principal. Enzo did not recall telling the Bank that he had borrowed $100,000 from the Florida Bank in 1982—guaranteed by stock owned by Sarah—to pay off Mr. Gruet.

The $200,000 Note and the $100,000 Note (collectively, the "Notes") required interest to be paid on a quarterly basis. Each quarter Ms. Korb would send a letter to Enzo and a letter to Mr. Fabris (Enzo's business partner in CRL) letting each know the amount of interest that needed to be paid on the Notes. While the Notes remained outstanding, Sarah paid the interest as it became due from her Florida Bank Account, since Sarah had her own demand notes as of June 1982 and the quarterly interest payment combined the interest for both the Notes and Sarah's separate demand notes. Enzo usually reimbursed Sarah for the interest Sarah paid. Sometimes Enzo pre-paid the interest due on the Notes. On one occasion, a separate account was set up at the Florida Bank to hold excess monies from Enzo and those funds were used to pay future interest payments and other reimbursements between Enzo and Sarah until the funds were exhausted. Ms. Korb kept detailed records of the amount of interest attributed to the Notes.

## H. Pebble Beach Townhouse

Sarah has always wanted her own place in Pebble Beach and, in 1981, she began looking for property. In September 1984, Sarah purchased a townhouse in Pebble Beach, California ("Townhouse"). Sarah obtained a $382,000 loan from the Florida Bank ("$382,000 Note") and assumed a $386,700 mortgage in connection with the purchase of the Townhouse. The $382,000 Note was secured by shares of Sarah's stock. Sarah located and purchased the Townhouse without any assistance from Enzo. On September 28, 1984, two grant deeds were recorded showing that: (1) the Townhouse was granted by the seller to "SARAH C. CECCONI, a married woman as her sole and separate property"; and (2) the Townhouse was transferred by Sarah to "GIUSEPPE E. CECCONI and SARAH COLEMAN CECCONI, husband and wife as Community Property".

In November 1984, Sarah received $600,000 in settlement funds ("Settlement Funds"). The Settlement Funds settled a claim arising from the theft of Sarah's jewelry from a New York hotel. In December 1984, Sarah used part of the Settlement Funds to repay the $382,000 Note in full. Sarah made all of the mortgage payments on the assumed mortgage until the Townhouse was sold. On August 9, 1989, Enzo signed a quitclaim deed transferring his community property interest in the Townhouse back to Sarah as her sole and separate property. The Townhouse was sold in April 1990 as Sarah's sole and separate property.

## I. The Property

On or about June 3, 1985, Sarah signed a Real Estate Purchase Contract and Receipt for Deposit ("Purchase Agreement") agreeing to purchase the land for the Property for $610,000. Sarah put down a $5,000 deposit. Paragraph 10 of the Purchase Agreement provides: "Unless otherwise designated in the escrow instructions of Buyer, title shall vest as follows: Instructions to follow."

On September 25, 1985, Mr. Coleman signed a $530,000 promissory note ("$530,000 Note") on Sarah's behalf. Enzo did not sign the $530,000 Note. The $530,000 Note was secured by shares of Sarah's stock. The same day $605,000 was wired from the Florida Bank to Bank of America in Monterey, California.

On October 4, 1985, two grant deeds were recorded for the two parcels of vacant land constituting the Property. Both grant deeds grant the parcels to: "GIUSEPPE E. CECCONI and SARAH COLEMAN CECCONI, husband and wife as Community Property." Trustee and Enzo and Sarah stipulate that Sarah used her sole and separate property to purchase the two parcels of vacant land constituting the Property. Neither Sarah nor Ms. Korb could recall who determined that title to the Property should be taken as community property.

Sarah located and purchased the land for the Property without the assistance of Enzo. Enzo did not like to live in America and specifically California, especially when he was commuting from London. Enzo signed various documents sent to him by Ms. Korb without reading them, including a variety of documents related to the fact that his name is on the grant deed as holding the Property as community property. Enzo testified that he deals with people he trusts and signs documents that he is asked to sign, but does not read the documents.

Both Sarah and Enzo testified that Enzo never had an interest in the Property. Ms. Korb testified that she understood that Enzo never had an interest in the Property and Sarah told Ms. Korb that

Enzo did not have an interest in the Property. The Duchess testified that she understood that Enzo never had an interest in the Property. Mr. Vanderweghe testified that he understood that Enzo never had an interest in the Property and both Enzo and Sarah told Mr. Vanderweghe that Enzo did not have an interest in the Property. Ms. Steel testified that she understood that Enzo never had an interest in the Property.

Enzo and Sarah both understood that what was Sarah's property was hers and what was Enzo's property was his. Consistent with this understanding, Sarah paid for the expenses of the Property and Enzo paid for the residence expenses in Europe. Enzo had a bank account in California to which he transferred funds prior to coming to America and would use for incidental expenses while in California. Sarah did not have an account in Venice or London. To obtain cash in London, Enzo provided Sarah with cash. To obtain cash in Venice, Sarah would write a check on her Florida Bank Account payable either to Enzo's brother, a bank manager at a bank in Venice, or to Enzo.

*Pre–Construction Activities*

After Sarah purchased the Property, it took nearly four years of effort on her part to obtain permission from various agencies to commence construction of the house. Both Enzo and Sarah testified that it was Sarah who acted to obtain the consent from the various agencies. Enzo took no action to secure those consents.

Sarah and Enzo are very private people in all respects, but especially about their personal financial affairs. Individuals who knew Sarah and Enzo well—for example, the Duchess, Mr. Coleman, Ms. Korb, Mr. Vanderweghe and Ms. Steel—were fully aware that Enzo had no interest in the Property and Sarah alone owned the Prop-

erty. This understanding was not broadcast publicly by Sarah and Enzo.

Certain vendors, contractors and others who did not know of Sarah and Enzo's special financial relationship merely assumed that because Sarah and Enzo were married, Sarah and Enzo owned the Property together. Sarah, who interacted with these people, did not correct their misunderstanding—consistent with her overall personality of not discussing personal issues outside of her immediate circle of family and advisors. Thus, there are various documents that list Enzo as an owner of the Property.

In this connection, Trustee admitted into evidence various documents from vendors, contractors and others that Trustee contends indicate Enzo is an owner of the Property—

(1) The Forest Management Plan for Residential Parcel Coastal Development Permit Application dated April 10, 1987 and prepared by Forester Hugh Smith and Hall Landscape Design states that the owner is Mr. and Mrs. Guiseppe E. Cecconi.

(2) The Botanical Survey dated June 16, 1987 and submitted to the Monterey County Planning Department by Hall Landscape Design states that the new residence is for Mr. and Mrs. Guiseppe E. Cecconi and the owner is Mr. and Mrs. Guiseppe E. Cecconi.

(3) The Design Approval Request dated February 19, 1988 and prepared by Alan Turpen/Associates states that the owner is Mr. and Mrs. Guiseppe E. Cecconi.

(4) Several Monterey County Planning Commission documents from June and July 1988 indicate Guiseppe Cecconi is the owner and the applicant for the coastal development permit.

(5) A Conservation and Scenic Easement Deed dated November 28, 1988 is signed by Mr. Coleman on behalf of both Enzo and Sarah and states in relevant part that the deed is "by and between GUISEPPE E. CECCONI and SARAH COLEMAN CECCONI as Grantor, and the DEL MONTE FOREST FOUNDATION, a nonprofit corporation, as Grantee."

(6) A Notice recorded on January 3, 1989 by the Monterey County Planning and Building Inspection Department signed by both Enzo and Sarah states in relevant part: "GUISEPPE E. CECCONI and SARAH COLEMAN CECCONI, are the owners in fee of the [Property]."

(7) An April 20, 1990 letter from Hall Landscape Design to the Monterey Coastal Planning Department states that the project is for Mr. and Mrs. Guiseppe Cecconi.

(8) A County of Monterey Sheriff's Department Application for Alarm Permit indicates that the owner is Sarah/Guiseppe Cecconi. Sarah testified that the name of the resident as "Cecconi Sarah/Guiseppe" was typed by some one else and Sarah handwrote "same as above" in the space for the full name of the owner/landlord.

Trustee also admitted into evidence an invoice from Brian Finegan and Michael D. Cling, a Professional Corporation, Sarah's attorneys for easements and permits on the Property. The invoice is addressed to Mr. and Mrs. G. Cecconi and indicates that Enzo attended an office conference on June 22, 1987 and Enzo also had a telephone call with the firm on June 25, 1987 and another telephone call with the firm on July 2, 1987 regarding the Planning Department file. Other invoices admitted into evidence by Sarah indicate that Enzo had a telephone call with the firm on December 31, 1987 regarding the status of an application; Sarah and Enzo had a telephone call with the firm on March 25, 1988; Enzo had a telephone call with the firm on April 5, 1988; and Enzo had telephone calls with the firm on December 30, 1988 regarding documents found by the county, and on March 23, 1989 regarding a hot tub problem. All invoices were addressed to Mr. and Mrs. Cecconi. Enzo testified that he had no interaction with Mr. Finegan other than perhaps driving Sarah to Mr. Finegan's office on one occasion. Sarah had numerous telephone calls with the firm during this period. The invoices do not indicate which party initiated the telephone call or the length of the call.

Trustee admitted into evidence a March 7, 1988 letter from Mr. Finegan to Kellie Morgantini of the Monterey County Planning Department that states in relevant part:

As you are aware, Cecconis [sic] were granted a Coastal Zone Special Permit by unanimous vote of the Planning Commission on October 14, 1987 (PC 5976). This application is for exactly the same house that was approved in that permit.

Thereafter, Mr. and Mrs. Cecconi applied to the Coastal Commission for their Coastal Development Permit. The Coastal Commission staff agreed to grant a de minimus waiver if the house were moved approximately 20 feet to the west and the garage moved from the east side of the house to the north side of the house. Mr. and Mrs. Cecconi were: in Europe at the time, so Mr. Turpen, their architect, submitted a redesign corresponding to the Coastal Commission staff wishes, and the de minimus waiver was issued.

When Mr. and Mrs. Cecconi returned from Europe and saw the revised plan,

they were very unhappy with the modifications, and notified the Coastal Commission that they were not willing to accept or build the modified plan. The Coastal Commission staff therefore rescinded the de minimus waiver. By then, the County had assumed the coastal permit process, so it became necessary for the Cecconis to make a new application for the Coastal Development Permit, this time to the County. Thus this application.

Trustee also admitted into evidence a May 17, 1988 letter from Mr. Finegan to Ms. Morgantini that carbon copied Mr. and Mrs. Cecconi.

Trustee admitted into evidence a drawing from Sarah's designer Alan Turpen/Associates that states that the drawing is a residence for Mr. and Mrs. Guiseppe Cecconi.

Both Ms. Korb and Sarah testified that only Sarah paid the invoices related to the Property. Sometimes the invoices related to the Property were in the name of both Enzo and Sarah and a few were solely in Enzo's name. For example, Trustee admitted into evidence an invoice from Jon Hagemeyer—a licensed land surveyor—dated November 8, 1988 addressed to Guiseppe Cecconi. Sarah admitted into evidence numerous invoices from Hunt Construction, the construction contractor for the house. The first Hunt Construction invoice—dated June 1, 1988—is addressed to Mr. and Mrs. Cecconi. The remaining subsequently-dated invoices are addressed to Sarah only. Sarah also admitted into evidence numerous invoices from Alan Turpen/Associates. All invoices from Alan Turpen/Associates are addressed to Sarah only.

*Repayment of the Notes*

During this time, Enzo did not repay the Notes for a variety of reasons. Initially, the London restaurant showed a very small profit in 1981 and 1982. The profit was larger in 1983. Through the mid-1980s, the gross annual takings of the London restaurant were between £1.8 million and £2.4 million with net annual takings of £140,000 to £200,000 before taxes. Enzo testified that he was unable to repay the $200,000 Note between 1984 and 1987 because CRL was liquidating Mr. Fabris' interest, repaying different debts, dealing with various issues regarding the Paris restaurant,[3] and renovating a mews house.[4]

In 1985, CRL purchased a lease on a mews house at No. 30 Eaton Mews North ("Mews House") for the personal use of Enzo. CRL paid for the Mews House and all expenses associated with it. Enzo testified that at this time in England, it was a common practice for individuals to charge all of their living expenses to the business. The practice was called benefit in kind.

Enzo extensively renovated the Mews House between 1985 and 1988, transforming the one-story house into a two-story one by elevating one full floor of the house. The renovations increased the value of the Mews House. Funds from CRL were used to fund the renovations, since CRL owned the Mews House. The renovations cost over $1 million and resulted in CRL drawing on its credit facility with the Bank. The Mews House secured CRL's debt to the Bank.

3. The Paris restaurant was sold around the beginning of 1985.

4. Mews houses are fashionable residences in London. They are little houses behind wealthy residences in London formerly used to house the horses, carriages and stable servants and later cars and chauffeurs. These houses are very expensive and in demand because the houses have a garage and little apartments above. Most property in London does not have a garage.

In 1988, Sarah and Mr. Coleman asked Enzo to repay the Notes to free up the stock collateral and permit Sarah to use that collateral to continue her construction on the Property. According to Enzo, the London restaurant was doing well in 1988. Enzo approached the Bank to obtain funds to repay the Notes. Enzo testified that the branch manager was aware that Sarah was building on the Property in California, but Enzo did not tell the branch manager that Enzo was going to put the funds into the Property. Enzo testified that he told the branch manager that he needed the money to repay the Notes and release Sarah's collateral so Sarah could borrow more funds and continue constructing the house on the Property.

The Bank admitted into evidence an internal Bank memo dated May 9, 1988 ("May Memo") regarding, *inter alia,* Enzo's request for an advance to pay the Notes. The May Memo states in relevant part:

> We refer to previous correspondence and write to advise you that we have had a meeting with Mr Cecconi to discuss the affairs of the companies shown overleaf and also Mr Cecconi's account with his wife.

> It is perhaps appropriate in the beginning to remind you that Mr Cecconi has maintained his banking connection with ourselves for around seven years during which time he has conducted his affairs entirely satisfactorily and during the same period has built up the high-class Italian Restaurant which bears his names and trades from 5A Burlington Gardens. It should be added that he was introduced to us by Lord Boyd of

Merton whom he knew when he was in the employment of the Guinness family. He is aged 52 and is married but has no family. His wife is an American lady, whose mother is the Dowager Duchess of Manchester and previously married to W.W. Crocker of Crocker Bank and is, we are told, extremely wealthy. So much so that they are building a property at Pebble Beach, California costing U.S. $5 million which is being found by Mrs Cecconi with the incidentals being found by Mr Cecconi. The reason for the delayed report is that he has only just returned from the USA. You will appreciate that effectively the two companies and Mr Cecconi are one entity. Having set the background we now refer to the draft accounts for Restaurants Ltd for the year ended 31 March 1987. You will observe that Turnover has increased to £1.6 million with Operating Profit coming out at £222,000 after Administrative Expenses higher at £789,000 reflecting increased drawings by Mr Cecconi. After tax of £83,000 and interest there remains £122,000 to be added to Capital and Reserves bringing out a Net Worth of £396,000. We were informed by Mr Cecconi that the stocks of wine included in the valuation of Stocks of £56,000 are in fact valued at nearer £300,000 and the freehold property is regarded by Mr Cecconi at around £400,000 compared to the Balance Sheet figure of £91,000, This property is 50 Charlwood Street and is the main residence of Mr and Mrs Cecconi.[5]

As to the year ended 31 March 1988, turnover is up to £1.7 million as can be seen from the enclosed schedule and Mr Cecconi is of the view that Operating

5. The property located at 50 Charlwood Street was purchased by CRL to provide accommodation for the chefs Enzo brought from Italy to work in the London restaurant. Enzo testified that he never lived in the Charlwood Property. Once the chefs obtained their own residence, CRL sold the Charlwood Property and the sale proceeds went into the Mews House.

Profits will be up by 10/15%. As to the current year, he is forecasting further progress and states that the Restaurant is very busy. Cash flow is very positive and accordingly there is no need seen for the overdraft facility and this may be cancelled. As to the value of the business using the usual formula of one year's turnover and allowing for the under valued assets a value of at least £2 million is reasonable.

Turning now to the 50 Charlwood Street, Mr and Mrs Cecconi are seeking to take the substantial profit on the property and to trade up market, and have been looking at properties in the Pimlico area on the market at around £800,000. In order to avoid tax and take advantage of roll over provisions he has been advised by Binder Hamlyn to form a subsidiary of Restaurants into which the existing property would be transferred and the new property acquired. . . .

. . .

We referred earlier in this Report to the property which Mr and Mrs Cecconi are building in California and which is being paid for in the main by Mrs Cecconi. Mr Cecconi has already paid £100,000 towards the incidental costs and now wishes to make a second and final payment of U.S. $300,000 in this respect.[6] He has asked us to consider adding the sterling equivalent of this sum, say £200,000 maximum to the amount outstanding on the Joint Account and for the balance to be repaid over the coming six years from drawings and bonuses from the Restaurant Company. As an alternative it may be possible for a Pension Policy to be used as the source of repayment but we are unable to comment further at this stage as we have not had the opportunity of speaking with

Mr Cecconi's advisers on this point. Our customer would also be willing to effect a term policy for the period of the borrowing and deposit his share in the Holding Company, Enzo Holdings B.V. as security. We would seek to agree a[sic] rate of Base + 2½% with a fee of £1,000 in respect of the additional facilities and we are prepared to recommend that we assist our customers with these additional facilities.

You will probably feel that the company is being asked to fund a substantial amount of borrowing and while this is true we do believe it will not create a problem. The business has a proven track record and it is regarded as a high-class restaurant of its type and having established its reputation it is not dependent on the day to day presence of Mr Cecconi. The cash flow is positive and the 1987 Operating Profit before the proprietors drawings was some £350,-000. Mr Cecconi believes the Company's tax bill will be reduced through drawings and bonuses paid to him to service the Joint Account overdraft and to pay rent to the new company to enable interest to be applied. We would suggest a monthly transfer of £9,000 from Restaurants to Mr Cecconi to meet the capital reductions on the Joint Account and the new company Account and quarterly transfers to meet the interest charges. There will also be substantial equity in the new property.

As you will see, we hold Mr Cecconi in high regard and would wish to assist him.

The Bank loaned Enzo $300,000 under an unsecured credit facility on the personal account in three installments of $100,000 each in December 1988, September 1989, and November 1989. Those funds were

---

6. Enzo testified that he contributed no funds toward the construction of the Property.

wired to the Florida Bank Account in those same months. A check was promptly written from the Florida Bank Account to pay off or pay down the Notes. The $100,000 Note was paid off in December 1988. In January 1989, the Florida Bank sought to convert all demand notes into loans with set maturities. Enzo and Sarah signed an amended note on February 2, 1989 for $200,000 representing a loan with maturity for the $200,000 Note ("Amended Note"). The Amended Note was paid off on November 30, 1989.

Also as part of the Florida Bank's consolidation of loans, on April 2, 1989, Sarah signed a promissory note for $660,000 ("April 1989 Note"). The April 1989 Note consolidated the $530,000 Note with two other notes held by Sarah. Only Sarah signed the April 1989 Note. The April 1989 Note was repaid in April 1990 from proceeds from the sale of the Townhouse.

*Financing the Construction of the Property*

Sarah borrowed funds from the Florida Bank to pay for the construction of the house on the Property. On August 11, 1989, Sarah borrowed $500,000 ("August 1989 Note"). On October 13, 1989, Sarah borrowed $100,000 ("October 1989 Note"). On November 20, 1989, Sarah borrowed $500,000 ("November 1989 Note"). Only Sarah signed the August 1989 Note, the October 1989 Note and the November 1989 Note. The August 1989 Note, the October 1989 Note and the November 1989 Note were converted to a $1.1 million mortgage on July 31, 1990. One reason for Sarah to take out a mortgage on the Property was that Sarah had a tax deduction for interest payments on her Townhouse mortgage until the sale of that property in April 1990, and could now use the Property for her mortgage deduction.

Both Enzo and Sarah signed the $1.1 million mortgage. Only Sarah signed the

Security Agreement as the "Debtor". Enzo signed the Security Agreement as a "Joinder" acknowledging: "The foregoing Security Agreement is hereby joined in by the undersigned, as Debtor's spouse, for the purpose of subjecting any rights or interests in the Collateral that he may have, under California law or otherwise, to the terms and provisions of the Security Agreement." The $1.1 million mortgage was refinanced on June 1, 1993 to take advantage of lower interest rates. Both Enzo and Sarah signed the refinance of the mortgage. The refinanced mortgage was paid in full in April 1998 from proceeds of a sale of Sarah's stock.

On March 23, 1990, Sarah borrowed $500,000 ("March 1990 Note"). On June 28, 1990, Sarah borrowed $300,000 ("June 1990 Note"). On December 14, 1990, Sarah borrowed $200,000 ("December 1990 Note"). Only Sarah signed the March 1990 Note, the June 1990 Note and the December 1990 Note. The March 1990 Note, the June 1990 Note and the December 1990 Note were secured by stock owned solely by Sarah. The March 1990 Note, the June 1990 Note and the December 1990 Note were consolidated into a master note and renewed on October 3, 1991 and again on October 5, 1992. The consolidated note was paid in full on April 15, 1994 from the proceeds of a sale of Sarah's stock. Only Sarah's financial statements were used to obtain the various loans and mortgage and only Sarah's collateral was used to secure the loans. Enzo's financial statements were not used to obtain the construction loans or the mortgage.

The construction of house on the Property cost between $3–4 million. This amount was more than expected and increased Sarah's monthly expenses through interest payments on the loans and the mortgage payment. The interest and

mortgage payments exceeded Sarah's monthly income from her dividend and royalty payments and the Property generated no income for Sarah. Sarah started to liquidate her stock, which produced large capital gains tax obligations, so Sarah had to liquidate more of her stock to pay the capital gains taxes, which reduced her monthly income, and created a downward spiral. As manager of Sarah's financial affairs, Mr. Coleman was concerned about the dwindling size of Sarah's stock portfolio.

In March 1993, Sarah met with Mr. Coleman and Douglas Sanders. Mr. Sanders was an accountant and attorney retained by Mr. Coleman to provide financial advice. In a follow-up letter dated June 2, 1993, Mr. Sanders recommended that Sarah liquidate stock to pay off $1 million in loans and also seek reimbursement from Enzo for one-half of the expenses of the Property. Sarah did liquidate the stock, but did not seek any reimbursement of expenses from Enzo, since Sarah did not believe that Enzo held any interest in the Property. In December 1993, Mr. Coleman recommended to Sarah that she sell the Property to ease Sarah's financial burden. Sarah did not sell the Property.

## J. Enzo's Financial Difficulties

Enzo struggled financially throughout the 1990s. The London restaurant lost many of its customers in the early 1990s in part due to the war in Iraq and because for two years the building where the restaurant was located was completely gutted and empty. CRL remained the only tenant in the building amidst the scaffolding and construction machines. In 1992, Enzo realized that even when he was fully booked the London restaurant was losing money. Enzo also had tax problems starting in 1996 based on a change in the tax laws to tax benefits in kind.

Enzo borrowed money from various individuals during the 1990s—including Sarah—to make CRL viable and salvage the company. The funds Enzo borrowed from Sarah were borrowed against brokerage accounts held by Sarah and secured by Sarah's stocks. Early on Enzo paid the interest on the borrowed funds, but as time went on, the interest started to accrue. As of December 31, 1997, Enzo owed Sarah over $770,000 in principal and accrued interest on monies he borrowed between 1992 and 1997.

On November 24, 1999, CRL entered into a contact to sell the London restaurant for £845,000. The sale was scheduled to close on December 23, 1999, and Enzo closed the London restaurant for trade on that date. However, an issue arose regarding the assignment of the lease and the close of the sale was delayed. Enzo had to pay rent and other operating expenses on the restaurant for eight months while the assignment of the lease was litigated in the courts. The sale of the restaurant eventually closed on June 26, 2000. Due in part to the additional expenses of over £200,000 during the pending sale closure, CRL entered into voluntary liquidation on July 13, 2000. At the time of its liquidation, Enzo owed CRL approximately £140,000 for unpaid director's loans. The Mews House was sold for £550,000 during the CRL liquidation and the business debt to the Bank was paid in full.

Involuntary bankruptcy proceedings were commenced against Enzo in November 2000. A order of bankruptcy was entered against Enzo on January 8, 2001 and an official receiver was appointed to Enzo's case. Enzo completed his Insolvency Service Bankruptcy Preliminary Information Questionnaire on October 3, 2001. Trustee was appointed to Enzo's case in October 2001.

## K. Post–Construction Transfers of the Property

On May 4, 1994, Sarah signed a grant deed ("May 1994 Grant Deed") transferring Sarah's community property interest in the Property to the Sarah C. Cecconi Living Trust. Both Enzo and Sarah signed the May 1994 Grant Deed. The May 1994 Grant Deed was recorded on January 6, 1995.

In 1995, Sarah was diagnosed with a virus of the thyroid. By 1998, Sarah was concerned that she would die of congestive heart failure as a result of her thyroid condition. Sarah wanted to be certain Enzo would be taken care of and have a roof over his head should Sarah predecease Enzo. On the advice of counsel, Enzo and Sarah executed the Cecconi Residential Trust to provide Enzo with the Property until he died. Neither Enzo nor Sarah understood that Enzo would own the Property if Sarah predeceased Enzo. It was the understanding of both Enzo and Sarah that should Sarah predecease Enzo, Enzo could live in the Property until Enzo died. Upon Enzo's death, the Property would to pass to Sarah's niece, Caroline Bassett. Enzo understood that he could not sell the Property or leave it to anyone other than Ms. Bassett. Neither Enzo nor Sarah believed that the Cecconi Residential Trust altered Sarah's sole ownership of the Property.

The Cecconi Residential Trust was signed on April 13, 1998. Under that trust, Sarah, as trustee of the Sarah C. Cecconi Living Trust, and Enzo transferred the Property into the Cecconi Residential Trust. The Cecconi Residential Trust states in relevant part in Recital A:

The trust estate will initially consist of the Settlors' principal residence located at 3190 Del Ciervo Road in Pebble Beach, California, together with any tangible personalty that is the Settlors'

community property located therein. The Settlors declare that any property held by them as joint tenancy prior to its transfer into the trust is in fact community property and, furthermore, that all property listed on Schedule A [description of the Pebble Beach property] is the community property of the parties.

Section 1.01 of the Cecconi Residential Trust provides in relevant part:

It is the Settlors' intention that the Trustee shall have no more extensive power over any community property transferred to the trust estate than either of the Settlors would have under California Family Code Sections 1100 and 1102 had this trust not been created, and this trust agreement shall be so interpreted to achieve this intention.

Section 7.03 of the Cecconi Residential Trust provides in relevant part:

This trust is established by the Settlors and is hereby accepted by the Trustee under the laws of the State of California. All questions concerning its validity, construction, and administration shall be determined under the laws thereof.

In connection with the Cecconi Residential Trust, on April 13, 1998, Enzo and Sarah executed a grant deed whereby "SARAH C. CECCONI, Trustee of The SARAH C. CECCONI LIVING TRUST established March 27, 1984, and all Amendments and Restatements thereto, and GUISEPPE E. CECCONI" granted the Property to "GUISEPPE E. CECCONI and SARAH C. CECCONI, Co–Trustees of The CECCONI RESIDENTIAL TRUST Dated April 13, 1998" ("April 1998 Grant Deed"). The April 1998 Grant Deed was recorded on April 14, 1998.

On August 13, 2001, Enzo and Sarah signed a grant deed ("August 2001 Grant Deed") that transferred the Property from

Enzo and Sarah as co-trustees of the Cecconi Residential Trust to Sarah as her sole and separate property. The August 2001 Grant Deed was not recorded.

## L. Litigation over the Property

On May 25, 2001, the Bank filed a complaint against Enzo and Sarah in the Monterey Superior Court for breach of contract and common counts ("State Court Litigation"). Enzo and Sarah filed a motion to dismiss the State Court Litigation in June 2001. In September 2001, the Bank learned that Enzo had been declared a bankrupt and ceased prosecuting the State Court Litigation.

Trustee filed an ancillary proceeding under 11 U.S.C. § 304 in this Court on January 7, 2002. Sarah filed her Complaint to Establish Purchase Money Resulting Trust against Enzo and Trustee on January 15, 2003. On February 21, 2003, Trustee filed his answer, counterclaim and cross-claim.

Trustee served Sarah with a First Set of Requests for Production to Plaintiff Sarah Cecconi ("Document Request") on or about April 1, 2003. In responding to the Document Request, Sarah reviewed her financial records from Mr. Coleman's office. These documents were located at the Property. When Mr. Coleman died, Ms. Korb boxed up Sarah's records located at the Florida office and shipped the records to Sarah at the Property. There were six to eight boxes shipped to Sarah containing over 4,000 pages of the documents. One or two of the boxes were lost in transit.

Ms. Korb assisted Sarah in searching for documents for this litigation, since Ms. Korb is very familiar with the majority of documents.[7] Most, but not all, of the documents Ms. Korb reviewed in response to the Document Request were still in the files as they had been kept by Mr. Coleman. Sarah had hired three or four secretaries between 1998 and 2003 who had started to file the documents for Sarah, so some of the documents from Mr. Coleman's office were not in the boxes. Neither Ms. Korb nor Sarah had a copy of the Document Request at hand while searching through the documents. Sarah's counsel did not personally search through Sarah's files from Mr. Coleman's office. Neither Sarah nor her counsel asked other individuals who assisted her with the permits and construction of her house for copies of documents pertaining to the Property.

When Sarah collected documents to produce to Trustee, Sarah removed her social security number, telephone number and Wells Fargo Bank account number from the original documents. Sarah also removed the Duchess' address from the Wells Fargo Bank documents. Sarah has an oral agreement with the Duchess not to disclose personal information regarding the Duchess for privacy reasons. Sarah had several conversations with her counsel before whiting out the personal information. Sarah understood from those conversations that whiting out the personal information was okay. Sarah did not know it was wrong to white out personal information at the time that she was doing it.

Sarah also removed Enzo's name from some of the insurance documents. Sarah removed this information by whiting out the information on the original documents. Sarah whited out the information at the Kinko's store using the white-out supplied by Kinko's prior to producing the documents. Sarah removed Enzo's name from some of the insurance documents because she was mad at Enzo for getting her in-

---

7. Ms. Korb had moved to California in July 2002 and started working part-time for Sarah

in October 2002 assisting Sarah with Sarah's bills and overseeing things at the Property.

volved with a lawsuit with the Trustee and she was mad at the Bank for coming after her-via the Trustee-when she had paid all of the bills on the Property. Sarah whited out Enzo's name on only some of the insurance documents because there were so many. Sarah did not know it was wrong to white out Enzo's name at the time that she was doing it. Only Sarah whited out information from the documents produced. Neither Ms. Korb nor Enzo whited out any information.

Sarah's counsel knew that Sarah had whited out the private information prior to producing copies of the documents in response to the Document Request. The only communication to counsel for Trustee regarding the whiting out of the produced documents was a statement in the formal response objecting to disclosure of personal information. Counsel for Trustee was not notified specifically of the whiting out of produced documents. Sarah's counsel was not aware that Sarah had whited out Enzo's name on the insurance documents at the time those documents were produced in a supplemental production in January 2004.

On the eve of trial, Trustee brought a Motion for Evidentiary Sanctions Against Adversary Plaintiff Sarah Cecconi ("Sanction Motion") based on Sarah's alteration of certain produced documents. In the Sanction Motion, Trustee requested that this Court dismiss Sarah's claims for her alteration of the produced documents. Alternatively, Trustee requested an order deeming that Sarah's alteration of the produced documents is an admission that the altered documents showed that Enzo was a beneficial owner of the Property. Trustee also requested that counsel for Sarah certify under penalty of perjury that Sarah had not altered any other documents and had not failed to produce any documents responsive to Trustee's discovery requests.

Absent such certification, Trustee requested that the Court establish the adverse inference that specific documents, namely the escrow instructions for the Property, contracts for architectural and construction work on the Property and additional insurance policies contain statements supporting the claim that Enzo and Sarah owned the Property as community property. The Sanction Motion was argued at the start of the trial and the Court carried that motion with the trial.

Also on the eve of trial, Trustee brought a Motion to Clarify Order on Summary Judgment ("Clarification Motion") to clarify this Court's order on a prior motion for summary judgment ("Summary Judgment Order"). In the Clarification Motion, Trustee requested that the Summary Judgment Order be modified such that the language:

That Spicer's motion for summary judgment is partially granted to the extent it shall be, and it is hereby is [sic], adjudicated that the transfer of the Pebble Beach Property into the residential trust did not alter the nature of the interest Debtor may have, if any, in the Pebble Beach Property, that is subject to any right that Sarah may have for the imposition of a purchase money resulting trust; and

be deleted and replaced with:

That Spicer's motion for summary judgment is partially granted to the extent it shall be, and hereby is, adjudicated that the transfer of the Pebble Beach Property into the residential trust did not operate to divest Debtor of his ownership interest in the Pebble Beach Property, if any; and

The Clarification Motion was argued at the start of the trial and the Court carried that motion with the trial. Based on the Court's legal analysis of the issues in this trial, the Clarification Motion is denied.

## II.

### ANALYSIS

#### A. Discovery Sanctions

■ The Cecconis assert that this Court should deny the Sanction Motion because the Cecconis did not have sufficient notice of the motion. The Sanction Motion was filed on Wednesday, March 16, 2005. On that same day, the Cecconis consented to the Court hearing the Sanction Motion at the start of the trial on Monday, March 21, 2005. Counsel for Enzo and Sarah had the opportunity to examine the Cecconis and Ms. Korb at trial regarding the Sanction Motion. The Cecconis also called Ms. Seid to testify regarding the same. The Cecconis had the opportunity to brief their opposition to the Sanction Motion in post-trial briefing. The Court finds that the Cecconis have had sufficient opportunity to present their opposition to the Court.

■ In the Ninth Circuit, bankruptcy courts may impose sanctions as part of their inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." [8] *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1066 (N.D.Cal.2006), citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Trustee seeks dismissal sanctions for (1) the Cecconis' alleged failure to conduct a thorough review of documents in their possession and (2) Sarah's alteration of evidence.

#### 1. Dismissal of Claims

#### a. Failure to Conduct a Thorough Review of Documents

Trustee asserts that this Court should dismiss Sarah's claim for a resulting trust

on the basis that the Cecconis failed to conduct a thorough review of all documents in their possession prior to the trial. Trustee alleges Sarah failed to produce scores of documents that she should have—a few of these documents were produced on the eve of trial and many are documents that Trustee alleges exist and which Sarah testified she does not have.

■ This Court has "inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d 585, 589 (9th Cir.1983) (citation omitted). "The requirements of due process limit the court's exercise of its inherent power. Dismissal is a permissible sanction only when the deception relates to the matters in controversy, and because dismissal is so harsh a penalty, it should be imposed only in extreme circumstances." *Id.*

■ The facts in this case do not support terminating sanctions for Sarah's alleged failure to conduct a thorough review of her documents under Ninth Circuit authority. For example, in *Wyle*, the Ninth Circuit held terminating sanctions appropriate where there has been a finding that the plaintiff continued to deny it engaged in rebating after it was learned by counsel that the party had in fact so engaged. *Wyle*, 709 F.2d at 589–91. There was a willful failure to produce documents evidencing the rebating. In *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337 (9th Cir.1995), the Ninth Circuit upheld terminating sanctions

**8.** In his Sanction Motion, Trustee argues that this Court has the power to impose sanctions under Rule 37 and under this Court's inherent powers. As explained in *Unigard Security Ins. Co. v. Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992), sanctions under Rule 37(b) require some form of court order that has been disobeyed, and that does not exist here.

where the defendant repeatedly lied to the district court, asserting that documents related to the case were destroyed in a fire while all along the defendant knew that legible records relevant to the case were in the possession of a police department.

Here the Court finds that Sarah did not willfully deceive the Court regarding relevant documents in her possession or control. Sarah testified that she and Ms. Korb reviewed the documents sent from Mr. Coleman's office to Sarah. Sarah credibly testified that she did not know until Trustee filed his trial brief that Trustee was asserting that the $300,000 in funds wired by Enzo to Sarah's Florida Bank Account between December 1988 and November 1989 were used to improve the Property. Sarah previously did not believe that documents relating to the loans between Enzo and Sarah were relevant to this litigation.

The Court also finds that Sarah has not engaged in conduct utterly inconsistent with the orderly administration of justice. Trustee asserts that neither he nor this Court "can be at all confident that [Mrs.] Cecconi has not altered, destroyed, or concealed other documents that she felt might be harmful to her, or beneficial to [Trustee]. The conclusion that this has not been a fair trial is inescapable." Trustee's Post–Trial Brief at 68:22–25. The Court disagrees with Trustee. Sarah testified credibly that she altered evidence to protect her and the Duchess' private information and also that she whited out Enzo's name from some of the insurance documents because she was mad at Enzo for getting her involved in this lawsuit.[9] There is no evidence that Sarah systematically reviewed documents in her possession and decided not to produce them.

There is also no evidence that any alteration of information on documents was to prevent Trustee from finding out what that information was. Under the facts of this case, there is no basis for this Court to impose terminating sanctions or any other sanctions for Trustee's alleged failure to conduct a thorough review of her documents.

### b. Alteration of Evidence

 Trustee also argues that this Court should dismiss Sarah's claims for her alteration of evidence. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Napster*, 462 F.Supp.2d at 1067. The power to sanction may be invoked in response to the alteration of evidence. *Id.* at 1066.

Courts may sanction parties responsible for spoilation of evidence in three ways. First, a court can instruct the jury that it may draw an inference adverse to the party or witness responsible for destroying the evidence. Second, a court can exclude witness testimony proffered by the party responsible for destroying the evidence and based on the destroyed evidence. Finally, a court may dismiss the claim of the party responsible for destroying the evidence.

A party's destruction of evidence need not be in "bad faith" to warrant a court's imposition of sanctions. District courts may impose sanctions against a party that merely had notice that the destroyed evidence was potentially relevant to litigation. However, a party's motive or degree of fault in destroying

---

9. Sarah produced insurance documents with Enzo's name on the documents *and* knew that she had produced those documents, so her explanation that she acted out of annoyance rather than an intention to alter evidence is credible.

evidence is relevant to what sanction, if any, is imposed.

*Id.* at 1066–67 (citations omitted).

When considering a default sanction in response to spoliation of evidence, the court must determine "(1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, [and] (4) the relationship or nexus between the misconduct drawing the [default] sanction and the matters in controversy in the case." In addition, the court may consider the prejudice to the moving party as an "optional" consideration where appropriate. This multi-factor test is not a "mechanical means of determining what discovery sanction is just," but rather "a way for a district judge to think about what to do."

"Dismissal under a court's inherent powers is justified in extreme circumstances." In the Ninth Circuit, "extraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case." Given this requirement of extraordinary circumstances, courts have held that a party's "failure to preserve evidence that they knew or reasonably should have known would be relevant to a potential action and might be sought in discovery" does not necessarily warrant default or dismissal if these actions "do not eclipse entirely the possibility of a just result."

*Id.* at 1070–71 (citations omitted). As noted above, there is no evidence of a disregard for this Court's orders on Sarah's part and there is no evidence of deceptive litigation tactics that threaten to interfere with the rightful decision of this case. Sarah's alteration of evidence that she reasonably should have known would be

relevant in this case does not warrant dismissal because her actions "do not eclipse entirely the possibility of a just result." *Id.* at 1071.

### 2. Exclusion of Evidence

 A federal court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence. Such power includes the power where appropriate to order the exclusion of certain evidence.

*Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993) (citations omitted). Excluding evidence depends upon the extent to which the opposing party is unfairly prejudiced by the alteration. *Napster,* 462 F.Supp.2d at 1077–78. "This analysis must be made in light of the requirement to impose the 'least onerous sanction' given the extent of the offending party's fault and the prejudice to the opposing party." *Id.* at 1078.

In *Glover,* the plaintiff's expert examined a lighter that was the subject of the lawsuit. During that examination, there was some spoliation to the lighter, but the defendant's expert was able to examine the lighter sufficiently. The Ninth Circuit stated, that "[a]lthough the actions of [plaintiff's expert] and [plaintiff]'s counsel were careless, for which those parties were admonished, by the court, the court was well within its discretion to find the lighter and [plaintiff's expert]'s testimony admissible notwithstanding the alleged spoliation." *Glover,* 6 F.3d at 1329.

 As with the *Glover* case, Sarah's actions in whiting out what she believed to be private information and also Enzo's names from some of the insurance documents were careless. However, those acts did not preclude Trustee from knowing what information those documents contained. Both Trustee and this Court were able to determine what information was

covered up by Sarah. This Court finds that excluding the whited out evidence is not an appropriate sanction.

### 3. Adverse inference

] As a sanction for Sarah's alteration of documents, this Court could also "draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover*, 6 F.3d at 1329. As explained by the Ninth Circuit,

> [t]he adverse inference sanction is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . . The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

*Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991).

██] The Court finds that the two rationales for the sanction of an adverse inference do not apply in this case. First, Sarah did not alter the various documents because she noticed that the document was relevant to the litigation and was threatened by that document. This Court finds that Sarah altered most of the documents to protect her private information—telephone number, social security number and driver's license number—rather than because she was threatened by that information. Likewise, this Court finds that Sarah whited out Enzo's name on some of the insurance documents not because she be-

lieved that those documents were damaging to her case, but because Sarah was angry with Enzo. Further, Sarah did not white out Enzo's name on all of the insurance documents because she became tired of whiting out the information. It was apparent from looking at all of the documents produced that Enzo's names was on the insurance documents. The evidentiary rationale for imposing an adverse inference sanction does not apply in this case.

The second rationale for imposing an adverse inference sanction is based on the assumption that allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. Here, while some evidence was altered by the application of liquid white-out by Sarah, that alteration did not prevent the evidence from being introduced at trial and did not prevent either Trustee or this Court from ascertaining what those documents said. Under the facts of this case, the imposition of a monetary sanction is a sufficient sanction to remedy the alteration of evidence.

### 4. Monetary sanctions

 This Court can impose monetary sanctions where one party has wrongfully destroyed evidence. *Napster*, 462 F.Supp.2d at 1078. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Id.* at 1067.

 Here, Sarah has admitted that she whited out information on various documents related to this case. The whiting out of information falls into two categories—private information Sarah was under the impression she could delete based on conversations with her counsel and covering up Enzo's name on some of the insur-

ance documents. Sarah did not inform her counsel of the removal of Enzo's name on some of the insurance documents.

As noted previously, the whiting out of information on the various documents has not impaired this Court's ability to read or interpret the various documents placed into evidence. However, there should be some sanction for Sarah's blatant alteration of original evidence before trial and after Sarah knew of Trustee's claims against her.

Trustee requests all trial costs, including his attorneys fees as the appropriate monetary sanction. Trustee bases this request on the extreme nature and scope of the abuse, resulting in a protracted trial without adequate access to relevant evidence. As stated above, this Court does not agree with Trustee that relevant evidence has been withheld by Sarah. Moreover, the Court does not agree with Trustee that the alteration of evidence is extreme in nature. Thus, a sanction for the entire costs of the trial is inappropriate.

However, Trustee is entitled to an award of attorneys fees that is reasonable in light of Sarah's alteration of various documents. The Court notes that the trial was extended and Trustee was required to file additional documents to address the whited out information. Namely, the cross-examination of Enzo, Sarah, Ms. Korb and Ms. Seid were extended to address the whiting out of documents. In addition, Trustee had to file the motion for sanctions, prepare a summary chart of known white-outs, conduct multiple reviews of the produced documents, and brief the discovery sanctions issue post-trial. The Court is unable to determine an appropriate monetary sanction on the current record. Trustee is ordered to submit a request for a specific amount of fees, with evidentiary support, for the Court's consideration.

## B. Purchase Money Resulting Trust

██ Record title to the Property was originally taken in the names of Enzo and Sarah as community property. Sarah asserts that Enzo holds legal title only and the Cecconis intended that Sarah hold the full beneficial interest in the Property. Trustee asserts Enzo holds a community property interest in the Property consistent with record title. In an ancillary proceeding, a United States bankruptcy court must determine whether property is property of the estate under local law prior to turning over property. *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 349 (2d Cir.1992). Trustee's interest in the Property, if any, is determined by California law. *In re Mantle*, 153 F.3d 1082, 1084 (9th Cir.1998)(bankruptcy courts must look to state property law to determine whether property is to be included in a bankruptcy estate).

### 1. Presumptions and Burdens of Proof

██ Under California law,

[a] resulting trust arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest.... Ordinarily a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price, or a part thereof, is paid by one person and the title is taken in the name of another. The trust arises because it is the natural presumption in such a case that it was their intention that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired.

*Lloyds Bank California v. Wells Fargo Bank*, 187 Cal.App.3d 1038, 1042–43, 232 Cal.Rptr. 339 (1986) (citations omitted).

Trustee asserts he is entitled to two presumptions under California law. First, pursuant to California Evidence Code § 662: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing evidence." The clear and convincing burden applies when valid legal title is undisputed and the controversy involves only beneficial title. *Murray v. Murray,* 26 Cal.App.4th 1062, 1068, 31 Cal.Rptr.2d 855 (1994). Sarah agrees with Trustee on this presumption and the clear and convincing burden of proof.

▮▮▮▮▮▮ Second, Trustee asserts he is entitled to a gift presumption. Under the gift presumption, when property is purchased by one person and title taken in whole or in part in the name of another, a gift is presumed if the grantee is the natural object of bounty of the person who paid for the property. *Lloyds Bank,* 187 Cal. App.3d at 1043, 232 Cal.Rptr. 339. Trustee asserts that the gift presumption applies whether a husband puts property into his wife's name or whether a wife puts property into her husband's name.

Sarah argues California law follows Restatement (Second) of Trusts § 442 which provides:

> Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property.

Sarah asserts that under the literal language of this section and California case law, the gift presumption does not apply in favor of a husband where the wife provides the funds to purchase the property. *See Socol v. King,* 36 Cal.2d 342, 348, 223 P.2d 627 (1950)("the presumption of a resulting trust [under now repealed California Civil Code § 853 [10]] arises where title to property is taken in the name of the husband and the consideration for the transfer is furnished by the wife"); *Owings v. Laugharn,* 53 Cal.App.2d 789, 791–92, 128 P.2d 114 (1942) (" 'Where a husband purchases property with money which is part of the separate estate of his wife and takes title in his own name, equity regards the purchase as made in trust for the: wife. From such facts alone, there is no presumption of a gift from the wife which would change the status of the property to that of the community, the presumption being that it continues to be the separate property of the wife held in trust for her by her husband.' " (citation omitted)); *McKinnon v. McKinnon,* 181 Cal.App.2d 97, 104, 5 Cal.Rptr. 43 (1960)("The presumption that there was a trust, *and not a gift,* arises where title to the property is taken in the name of the husband and the consideration for the transfer is furnished by the wife." (emphasis in original)).

Trustee counters that the *Lloyds Bank* case—decided under repealed California Civil Code § 853—supports a "gender-neu-

---

**10.** Former California Civil Code § 853 provided:

> When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made.

Former California Civil Code § 853 was repealed in 1986 and omitted from the comprehensive revision of the law of trusts " 'because it is an incomplete and inadequate statement of the common law purchase money resulting trust;' ... its repeal 'is not entitled to disturb California case law concerning resulting trusts.' " *Johnson v. Johnson,* 192 Cal.App.3d 551, 556 n. 1, 237 Cal.Rptr. 644 (1987).

tral" gift presumption. The *Lloyds Bank* court held that where the grantee of the property is the child or other natural object of the affections of the grantor, the gift presumption arises. *Lloyds Bank*, 187 Cal.App.3d at 1043, 232 Cal.Rptr. 339. While *Lloyds Bank* dealt with a parent-child relationship, Trustee argues that this Court should interpret the "natural object of the affections of the grantor" language to include wife-husband transfers. Trustee contends that the "gender-biased" position argued by Sarah regarding resulting trusts between wives and husbands is contrary to the state constitution equal protection clause and California courts would adopt the more "gender-neutral" rule stated in the Restatement (Third) of Trusts § 9.[11]

The Court does not find Trustee's argument persuasive. When the California legislature revised the law of trusts in 1986, the legislature did not alter the California case law under *Socol*, *Owings* or *McKinnon* that specifically holds that where a wife provides the consideration and the property is taken in the husband's name there is no gift presumption. The California Law Revision Commission specifically stated that the repeal of California Civil Code § 853 "is not entitled to disturb California case law concerning resulting trusts." *Johnson v. Johnson*, 192 Cal. App.3d 551, 556 n. 1, 237 Cal.Rptr. 644 (1987). Absent California case law adopting Restatement (Third) of Trusts § 9 to overturn the current case law on purchase money resulting trusts, this Court will not apply the more "gender-neutral" rule stated therein.

Sarah argues that while a person attempting to establish a resulting trust must prove by clear and convincing evidence that they purchased the property, no California court has addressed the standard of proof for determining donative intent. According to Sarah, Comment f(1) to the Restatement (Third) of Trusts § 9 states that the standard of proof for determining donative intent is preponderance of the evidence and this is the standard that the Court should use.[12] Sarah asserts that once she shows that she paid the purchase price for the Property, the burden shifts to

---

11. The Restatement (Third) of Trusts § 9—addressing purchase money resulting trusts—provides in relevant part:

(1) Except as stated in Subsection (2), where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid unless

(a) the latter manifests an intention that no resulting trust should arise, or

(b) the transfer is made to accomplish an unlawful purpose, in which case a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction.

(2) Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a spouse, descendant, or other natural object of the bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property.

12. Comment f(1) to Restatement (Third) of Trusts § 9 provides:

*Burden of proof.* Under either subsection (1) or Subsection (2), the party alleging the purchase-money resulting trust has the burden of proving by clear and convincing evidence that the claimant (or a predecessor in interest) paid or furnished the purchase price or claimed a portion thereof.

If that initial showing is made in a case under Subsection (1), and the transferee introduces evidence tending to show that the funds were paid or furnished by the payor as a loan or with an intention to make a gift, or for other intended or agreed purpose that might rebut the resulting-trust inference, the ultimate burden then is on the payor (or a successor in interest) to establish the existence and extent of the resulting-trust interest by a preponderance of the evidence.

Trustee to produce some evidence that Sarah gifted an interest in the Property to Enzo when she put his name on legal title. Upon Trustee meeting this showing, the ultimate burden of proof would then be on Sarah to establish the existence and extent of the resulting trust by a preponderance of the evidence. For the reasons stated above, this Court will not apply Restatement (Third) of Trusts § 9 to this case, especially where that Restatement contradicts California case law.

 Under California law, "one who claims a resulting trust in property has the burden of proving the facts establishing his beneficial interest by clear and convincing evidence." *Gomez v. Cecena,* 15 Cal.2d 363, 366–67, 101 P.2d 477 (1940) (citations omitted); *accord McKinnon,* 181 Cal.App.2d at 104, 5 Cal.Rptr. 43 ("The burden of proving the elements necessary to establish a trust rests upon the party asserting its existence."). Under *Gomez,* to prevail on her claim, Sarah must show by clear and convincing evidence that she paid for the Property and that she did not intend to give Enzo a beneficial interest in the Property when his name was placed on record title.

> "Where the legal title rests in one person, to establish a resulting trust for the benefit of another against a presumption in favor of the legal title, the evidence must be clear and convincing, especially when an attempt is made to establish a resulting trust after the lapse of many years or where parol evidence alone is relied upon."

*G.R. Holcomb Estate Company v. Burke,* 4 Cal.2d 289, 299, 48 P.2d 669 (1935) (citations omitted). "Parol evidence is admissible to prove the existence of a resulting trust" and such evidence does not violate the statute of frauds since such a trust is based in part on the fact that there is no writing. *Jones v. Gore,* 141 Cal.App.2d 667, 673, 297 P.2d 474 (1956). *Accord Owings,* 53 Cal.App.2d at 793, 128 P.2d 114.

 Trustee asserts that the clear and convincing standard requires evidence "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind." *In re Angelia P.,* 28 Cal.3d 908, 919, 171 Cal.Rptr. 637, 623 P.2d 198 (1981) (citations omitted). Trustee argues that contradictory and vague testimony does not meet this standard. Moreover, if the evidence is doubtful or a reasonable contrary inference can be made regarding the parties' intent, then the evidence is insufficient to meet the clear and convincing burden. However, a resulting trust is established by clear and convincing evidence if the evidence "has satisfied the conscience of the chancellor before whom the trial was had, and [the appellate] court cannot say that the evidence clearly preponderates against the finding." *G.R. Holcomb,* 4 Cal.2d at 299, 48 P.2d 669 (citations omitted). Here the Court finds that Sarah's evidence is "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind," including that of this Court. *In re Angelia P.,* 28 Cal.3d at 919, 171 Cal.Rptr. 637, 623 P.2d 198.

**2. Sarah Has Proven a Resulting Trust by Clear and Convincing Evidence.**

**a. Sarah Paid for the Property.**

 While Trustee concedes that Sarah paid for the vacant land of the Prop-

---

In a case under subsection (2), one who has proved a claim of having provided the purchase price has the further burden of rebutting the inference of gift by a preponderance of the evidence, weighed in light of the circumstances of the parties and the nature of the particular natural-object relationship.

erty, Trustee argues that Sarah failed to prove that she paid for the improvements on the Property solely with her separate funds. First, Trustee asserts that the $300,000 Enzo borrowed from the Bank in 1988 and 1989 was used to improve the Property. Trustee argues that the alleged loans made by Sarah to Enzo in 1981 and 1982 were not bona fide loans because Enzo felt no need to repay the Notes and the alleged loans are not reflected on the financial statements of Enzo's London restaurant from that time period. In addition, Sarah's monthly reconciliation statements show that Enzo contributed approximately $582,000 from 1982 to 1991 in funds to the Florida Bank Account.[13] Finally, the Bank's records indicate that the $300,000 wired to the Florida Bank in 1988 and 1989 was used for the specific purpose of improving the Property. The purchase and development costs of the Property were paid from this account. Second, Trustee asserts that the proceeds from the sale of the Townhouse were community property and retained that characterization when applied to the Property. According to Trustee, all this evidence supports the inference that the Property was jointly financed by the Cecconis.

The Court finds by clear and convincing evidence that the initial purchase price and all costs of improvement were financed solely by Sarah. First, the Court finds that the Notes were legitimate loans between Sarah and Enzo. Both Enzo and Sarah credibly testified that the Notes were loans and both Enzo and Sarah understood that Enzo was responsible for the repayment of the Notes and any interest. Ms. Korb testified that she made all loan arrangements for Sarah. Ms. Korb reconciled Sarah's Florida Bank Account statements each month and prepared the monthly reports of Sarah's income and expenses. Ms. Korb consistently, repeatedly and very credibly testified that she understood that the Notes—including interest—were to be repaid by Enzo and the loans were neither gifts to Enzo nor investments in Enzo's business. Ms. Korb testified that she kept track of the interest on the Notes separate from the interest that accrued on the various demand notes signed solely by Sarah. Ms. Korb also testified that she reflected Enzo's interest payments on Sarah's monthly reports. Ms. Korb testified that she sent letters to Enzo indicating the amount of the quarterly interest that he owed on the Notes.

The testimony of Sarah, Enzo and Ms. Korb is supported by the documentary evidence. Both Enzo and Sarah signed the Notes while only Sarah signed the other demand notes from the Florida Bank. Additionally, Ms. Korb sent letters to Enzo and to Mr. Fabris—Enzo's partner in CRL—requesting payment of the interest owed under the Notes. Sarah's monthly report for January 1981 shows that the proceeds from the $200,000 Note were deposited into the Florida Bank Account and used to repay the $200,000 loan guaranteed by the Duchess to start the London restaurant. Sarah's monthly report for January 1982 shows that the proceeds from the $100,000 Note were deposited into the Florida Bank Account and used repay a bridge loan from Mr. Coleman.[14] Sarah's monthly report for December 1988 shows that Enzo wired $100,000 to the account and those funds were immediately used to fund check # 2813 in the amount of $102,366.67 described in Sarah's

---

**13.** Trustee sets out the specific amounts in Appendix I to Trustee's Post–Trial Reply Brief.

**14.** Enzo testified that the original $100,000 bridge loan was used to cash out Enzo's financier in the Paris restaurant.

report as "First National Bank in Palm Beach Payoff of 100,000 note + int." Sarah's monthly reports for September 1989 and November 1989 reflect two $100,000 wires from Enzo. The September 1989 wire was immediately used to fund check # 3116 in the amount of $100,000 described in Sarah's report as "First National Bank—Paydown on 200,000 note." The November 1989 wire was immediately used to fund check # 3211 in the amount of $101,283.34 described in Sarah's report as "First National Bank in Palm Beach payoff interest and principal on $100,000.00 line of Credit Guiseppe Cecconi." Sarah's monthly report for January 1990 shows a deposit from Enzo in the amount of $1,283.34 for "Reimb. int."— equal to the additional interest Sarah paid the month before in paying off the Amended Note (the loan that replaced the $200,000 Note).

Trustee cites to $582,000 in funds transferred to the Florida Bank Account and infers that the Property was financed by Enzo and Sarah jointly. The Court does not find such an inference is supported by the evidence. The documents support the finding that the $582,000 in funds represent reimbursements for interest on the Notes and the repayment of principal.[15] The $200,000 Note had an initial annual interest rate of 18% and the $100,000 Note had an initial annual interest rate of 15.75%. Thus, annual interest on the $200,000 Note was initially $36,000 and annual interest on the $100,000 Note was initially $15,750. Enzo carried the Notes for over six years, so the question is whether $282,000 approximates the interest that accrued on the Notes while they were outstanding. It appears from Sarah's monthly reports that the interest rate on the Notes fluctuated between 1981 and 1989, but there is no direct evidence of the interest rate charged each quarter.[16] Sarah admitted into evidence numerous letters sent to Enzo or Mr. Fabris—Enzo's business partner—requesting payment for the quarterly interest on the Notes. These letters indicate that quarterly interest on the Notes ranged from $9,075 for the last quarter of 1982 to $7,126.19 for the third quarter of 1985 to $6,833.33 for the second quarter of 1986 to $7,069.78 for the fourth quarter of 1987. Based on all of the evidence, the Court is convinced and finds that the $582,000 in funds transferred to the Florida Bank Account were used to pay the principal and interest on the Notes.

Trustee asserts that the Notes are not actual loans because they are not reflected in the financial reports for CRL dated March 31, 1984; March 31, 1985; and March 31, 1986. However, the Court finds that there is no reason the Notes necessarily would have been so reflected. CRL's financial reports indicate that CRL is a wholly owned subsidiary of Enzo Holdings

---

15. The $582,000 also includes reimbursement for other de minimis expenses Sarah fronted for Enzo, for example, Enzo's air fare that was charged on Sarah's TWA charge card.

16. Shortly after Enzo took out the $200,000 Note in January 1981, Sarah took out her first demand note in June 1981. Once Sarah also had demand notes, the quarterly interest payments on the Notes and Sarah's demand notes were combined in one number on the monthly reports and paid by Sarah. Enzo subsequently reimbursed Sarah for his por-

tion of the interest payments except for one period in 1983 when Enzo pre-paid the interest and excess funds were placed in an interest-bearing account and drawn down to reimburse Sarah for interest and other personal reimbursements. There are certain periods of time—for example between April 1982 and April 1983 and between September 1983 and February 1984—where the principal amount due under the various demand notes is constant but the quarterly interest paid fluctuates.

BV, a company incorporated in the Netherlands. The original loan to Enzo from Bessemer Trust was distributed in large part to Enzo Holdings B.V. If the $200,000 Note was intended to replace the Bessemer Trust loan, it is likely that the entity that would have reported the loan would have been Enzo Holdings B.V. and not CRL. The fact that the $200,000 Note is not listed in the CRL financial report does not call into doubt the evidence that the Notes were, in fact, bona fide loans to Enzo.

Trustee next asserts that the Bank's records—specifically the May Memo indicating that Enzo's $300,000 borrowings were used for the Property—contradict Enzo's testimony and preclude a clear and convincing finding. The Court disagrees. The Bank's records are internal memos that reflect a general understanding by the Bank's personnel of Enzo's financial situation. Enzo testified that the internal memos were generally accurate, but noted certain instances where the records were not accurate. For example, the May Memo says that the Charlwood property was the residence of Enzo and Sarah, yet that residence is where the chefs lived in London and the Cecconis never lived there. Enzo was adamant that he did not represent to the branch manager or other Bank personnel that Enzo was funding the Property. Enzo insisted that he told the Bank that he needed to repay the Notes to permit his wife access to the stocks that secured the Notes so that Sarah could use the collateral to obtain additional financing to fund construction of the house on the Property. The Court finds Enzo's testimony to be credible.

The May Memo is consistent with Enzo's credible testimony that the Notes represented $300,000 of funds lent by Sarah to Enzo for his restaurants. The Bank lent Enzo the $300,000 on an unse-cured basis. The Bank did not lend the $300,000 secured by an interest in the Property. When Enzo renovated the Mews House, the Bank secured those borrowings by a lien on the Mews House. If the Bank had believed that Enzo held a beneficial interest in the Property and the $300,000 was going to be used for the Property, it is highly likely that the Bank would have taken, or at least demanded, a security interest in the Property. The Court finds the Bank's internal memos do not counter Enzo's clear and convincing testimony.

Trustee also argues that the proceeds from the sale of the; Townhouse are community property and should be treated as community property. The evidence does not support this assertion. The Townhouse was purchased in September 1984 with the $382,000 Note and Sarah's assumption of a mortgage. Only Sarah signed the $382,000 Note. This is consistent with the pattern of Enzo and Sarah that when only Sarah was responsible for a demand note, only Sarah signed the obligation. Sarah made all of the mortgage payments on the Townhouse from the Florida Bank Account. The $382,000 Note was paid in full in December 1984 with the Settlement Funds representing a recovery by Sarah from the theft of her jewelry. All funds used for the Townhouse were Sarah's separate property.

The Townhouse was purchased as separate property and transferred into community property. The Townhouse was transferred back to Sarah's separate property months prior to its sale. Enzo and Sarah always intended that the proceeds of the Townhouse were Sarah's sole and separate property. The quitclaim deed permitted legal title to be consistent with beneficial title at the time of sale. At the time of the sale, the Townhouse was held by Sarah as her separate property and all sale pro-

ceeds were Sarah's separate property.[17] Sarah's use of those proceeds to develop the Property is consistent with the assertions of both Enzo and Sarah that the Property was funded solely by Sarah's property.

There is no evidence that any funds Enzo paid into the Florida Bank Account were actually used to purchase or improve the Property. The Court finds that clear and convincing evidence demonstrates that the funds Enzo paid into the Florida Bank Account were used primarily to pay principal and interest on the Notes-which were bona fide loans between Sarah and Enzo. The Court further finds that clear and convincing evidence demonstrates that none of the funds Enzo paid into the Florida Bank Account were used to improve the Property.

### b. Sarah Intended to Hold Full Beneficial Interest in the Property.

■ Trustee asserts that based on Sarah's purchase of the Townhouse in Pebble Beach, it is evident that Sarah knew the difference between separate property and community property at all relevant times. By placing Enzo on record title, Sarah intended Enzo appear on title to the Property and necessarily intended that Enzo have a present beneficial interest in the Property. This argument begs the question. A purchase money resulting trust arises when another's name is placed on legal title but that entity is not intended to hold a beneficial interest in the property. In virtually all of the California purchase money resulting trust cases, the party seeking to impose the purchase money resulting trust intended for someone else to hold legal title.

For example, in *Jones v. Kelley*, 121 Cal.App.2d 130, 262 P.2d 859 (1953), a husband and wife intentionally took title in joint tenancy even though the property was purchased with the wife's separate assets. The wife testified that it was the understanding of her and her husband that the property was taken in joint tenancy so that if either spouse predeceased the other, the surviving spouse would hold full ownership of the property. One week before his death, the husband quitclaimed his joint tenancy interest to his daughter from a previous marriage. In an action to quiet title, the wife was awarded a resulting trust on the finding that the joint tenancy was held with the intent and agreement that the property would be held for the survivor of the husband and wife. The *Kelley* court noted that:

> The form of an instrument under which a husband and wife hold title is not conclusive as to the status of the property ... When there is an oral or written agreement as to ownership of the property, or where such an understanding may be inferred from the conduct and declarations of the spouses the terms of the deed are not controlling.

*Kelley*, 121 Cal.App.2d at 134, 262 P.2d 859. In *Kelley*, the testimony of the wife amply sustained her burden of proving a resulting trust by clear and convincing evidence. *Id.*

Similarly, in *Owings*, the wife's separate property was used to purchase several lots. The wife did not expect to live longer than six years at the time and told her husband to take title in his name so if anything happened to the wife, the husband would not have to go through court procedure and, if the wife recovered, the

---

**17.** The Court finds the actions of Enzo and Sarah with respect to the Townhouse consistent with the testimony of both Enzo and Sarah that they held property on record title as community property but there was no intention on the part of either Sarah or Enzo to give Enzo beneficial interest.

husband would give the lots back to the wife if she ever asked for them. *Owings,* 53 Cal.App.2d at 792, 128 P.2d 114. The husband later filed for bankruptcy and the wife brought an action to quiet title, claiming that the lots were her separate property. *Id.* at 790–91, 128 P.2d 114. At trial the husband testified that when the lots were purchased he agreed that he would transfer title to his wife if she ever requested. *Id.* at 792–93, 128 P.2d 114. The appellate court affirmed a judgment for the wife holding that the ultimate question is the parties' intent at the time the property is acquired. *Id.* at 792, 128 P.2d 114.

In *Seabury v. Costello,* 209 Cal.App.2d 640, 26 Cal.Rptr. 248 (1962), plaintiff in a quiet title action provided the entire purchase price for a home to be used by her mother. Since plaintiff's employment required that she travel extensively, plaintiff reached an understanding with her sister (defendant) that defendant would live with the mother in the home. Plaintiff also testified that the sisters agreed that the deed to the property would be placed in both their names as joint tenants, to simplify matters if plaintiff met an untimely death in some remote part of the world. Plaintiff claimed that it was understood from the outset that taking title in joint tenancy was not intended to confer a present interest in defendant. The principal purpose was to obtain the benefit of the right of survivorship in order to avoid possible litigation and expense. *Seabury,* 209 Cal.App.2d at 642–43, 26 Cal.Rptr. 248.

The defendant sister in *Seabury* agreed that the purpose in naming her on the joint tenancy deed was to obtain the benefit of the right of survivorship. Nonetheless, defendant maintained that an unqualified gift was intended and defendant introduced evidence that the sisters: (a) maintained a joint bank account into which each made deposits which were used for the maintenance of the house and for support of their mother; (b) owned and purchased household furnishings jointly; (c) maintained a safety deposit box in joint tenancy; and (d) owned an automobile jointly. *Seabury,* 209 Cal. App.2d at 643, 26 Cal.Rptr. 248. The appellate court upheld the trial court's determination that the facts supported the presumption in favor of a resulting trust—since plaintiff paid the purchase price for the property and the sisters had agreed that defendant was not to receive a present beneficial interest in the property—and negated defendant's contention that an executed gift was intended by the delivery of the deed. *Id.* at 645, 26 Cal. Rptr. 248.

Thus, the question is not whether Sarah intended that Enzo's name be on record title to the Property, but whether, in allowing Enzo's name to appear on title to the Property, Sarah intended to gift Enzo a beneficial interest in the Property or Sarah intended to retain the full beneficial interest for herself. One of the complicating facts in this case is that Sarah is unable to explain why title to the Property was taken in the names of both of the Enzo and Sarah as community property. There is no evidence that Sarah told her real estate agent how title was to be held and no evidence regarding who gave the instructions to place the record title as community property. Trustee argues that Mr. Coleman, with the assistance of Ms. Korb, handled Sarah's affairs after Sarah received the Trust inheritance and assumes it was Mr. Coleman who directed how title should be taken.

Regardless of who gave the instructions on how record title to the Property was to be held, the intent of Sarah's agents is irrelevant to a purchase money resulting trust analysis because there is no evidence that Sarah authorized her agents to make

a gift of one-half of her interest in the Property to Enzo and the Court finds that Sarah has demonstrated by clear and convincing evidence that she had no intention to do so. The only individual that might have had such authority is Mr. Coleman, and there is no evidence that Mr. Coleman had any authority to make such a gift. In fact, such a gift would be contrary to the evidence that showed that Mr. Coleman was concerned about both Sarah's financial affairs and Enzo's spending habits, and wanted to protect Sarah's assets.

Trustee puts much stock in the letter to Sarah from Mr. Sanders that suggests Sarah ask Enzo for a contribution of his portion of the Property expenses. However, there is no evidence that Mr. Sanders based his understanding of the ownership of the Property on anything other than a reliance on the record title. Sarah testified credibly that she did not follow Mr. Sanders' advice, in part because Sarah did not believe Enzo had any interest in the Property.

Trustee argues that Sarah's stated purpose of placing Enzo on title for estate planning purposes is consistent with an intent to give Enzo a beneficial interest in the Property since the only legitimate way for Sarah to obtain the tax and estate-planning benefits of holding title in community property with Enzo is for Sarah to have also intended that Enzo receive a present beneficial interest in the Property at the time she acquired the Property. However, the resulting trust cases permit Sarah to hold full beneficial interest in the Property if that was the original intent of the parties, even if so finding would eliminate any tax benefit for maintaining the Property as community property. *Martin v. Kehl*, 145 Cal.App.3d 228, 239, 193 Cal. Rptr. 312 (1983) (resulting trust permitted even where so finding would defeat the original reason for placing title in defendant's name); *In re Torrez*, 63 B.R. 751, 755 (9th Cir.BAP1986)(same).

The Court finds that Sarah has shown the existence of a purchase money resulting trust by clear and convincing evidence. First, both Enzo and Sarah credibly testified that neither Enzo nor Sarah intended for Enzo to hold any beneficial interest in the Property. Enzo credibly testified that it was his understanding that he had no ownership claim to the Property. Enzo understood that under Italian law, if the wife has property, the property remains the wife's and Enzo did not know that California law was different. To Enzo, the Property was obviously Sarah's and Enzo never thought for a moment that it was otherwise. Enzo testified that his understanding was consistent with the understanding between Enzo and Sarah regarding all of their properties—that what was Enzo's was Enzo's and what was Sarah's was Sarah's.

Sarah credibly testified that she never considered Enzo as an owner of the Property. Sarah bought the Property, it was her house, she worked hard for it and never considered it to be Enzo's. Moreover, Enzo did not particularly want to move to America. Sarah credibly testified that because she did not consider Enzo an owner of the Property, any document that reflected Enzo as an owner did not mean anything to her. It did not matter to Sarah that Enzo's name was listed. Sarah did not understand and did not pay much attention to financial and legal matters. As far as Sarah was concerned, the Property was hers and hers alone and Enzo had no interest in it, regardless of what any documents said. Prior to being sued by the Bank, it never occurred to Sarah that having Enzo reflected as an owner of the Property on any document could create rights in favor of his creditors against the Property.

Second, Enzo and Sarah conducted their financial affairs separately. When Enzo borrowed money from Sarah, Enzo signed the related demand note and was responsible for the payment of interest and the repayment of principal. Sarah had no interest in Enzo's European businesses. Contrary to Trustee's assertion, the evidence shows clearly and convincingly that Sarah used her stocks as collateral for bank loans to Enzo, but those loans were carefully tracked and the interest separately noted for Enzo's payment. There is no evidence in the record that at the time Sarah acquired the Property that Enzo held any interest other than being named on record title.

In *Gomez*, pre-marriage, the husband agreed with a friend to purchase a lot. The husband paid half of the down payment and seven or eight installment payments. The husband—still pre-marriage—asked his mother to assist in building a house on his half of the property and agreed that the mother would receive the property. The mother contributed some funds to build the house. The husband and the wife married and lived with the mother in the house for four years. When the wife sought a divorce, the mother asserted an interest in the property. The *Gomez* court found that while the purchase price was paid by the mother, the trial court was not bound by the mother's testimony as to her intent when the mother's subsequent conduct was more consistent with the presumption that she intended a gift to her son. The mother in *Gomez* acquiesced in her son conveying the property upon a deed of trust to secure his own debt. Two years later the mother moved out of the house leaving her son and his then wife in sole possession of the house. The son and wife made alterations and improvements on the premises apparently without permission or objection from the mother. In short, all of the ordinary rights and incidents of ownership were exercised and asserted by the son and his wife and not by the mother. That is not what happened in this case. Here the subsequent conduct of Sarah, as well as the conduct of Enzo, are consistent with Sarah holding the sole beneficial interest in the Property.

Sarah exercised her full beneficial interest in the Property after purchase. Sarah worked with Alan Turpen to design the house. Sarah was the one who obtained the various permits and other consents required to construct the house. Sarah oversaw the construction of the house. It was Sarah that put a mortgage on the Property based on Sarah's finances. Sarah paid all of the mortgage payments from her separate property and paid off the mortgage and other loans through sales of her stocks.

Sarah's signing of documents over the years that reflect Enzo as an owner does not preclude Sarah from asserting a resulting trust. *See, e.g., Torrez*, 63 B.R. at 752. Numerous documents reflected record title of the Property, but do not conflict with Sarah's credible testimony that she never intended to give Enzo an interest in the Property. Enzo's testimony, as well as the testimony of the Duchess, Ms. Steel and Mr. Vanderweghe, strongly support Sarah's assertion that Sarah designed and worked with the various entities to obtain permits to construct a house on the Property. The evidence shows that Sarah took out loans to pay for the construction and repaid those loans through the use of the proceeds from the sale of the Townhouse and the sale of her stocks. As noted above, there is no evidence that Enzo contributed financially to the Property.

While there is limited indication that the Finegan law firm had minimal contacts

with Enzo, such evidence does not indicate that Enzo had any significant interactions in the pre-construction and construction of the Property. The Finegan invoices do not indicate that Enzo initiated or actively participated in any conferences with the Finegan firm. During the pre-construction and construction period, Enzo was only in the United States for a small portion of the time. Moreover, Enzo was renovating the Mews House in London during this period and likely did not have time or energy to invest in the improvements on the Property. Furthermore, Enzo, like Sarah, always treated the Property as Sarah's separate property. Sarah made all financial and other decisions regarding the Property.

Moreover, the Bank's documents indicate that Enzo offered the Bank various collateral to secured the credit facilities he had with the Bank. The Court notes that there is absolutely no evidence that Enzo offered the Bank an interest in the Property to secure his obligations with the Bank. This is consistent with Enzo's belief that he held no beneficial interest in the Property.

The evidence shows clearly and convincingly that Sarah held the full beneficial interest in the Property when the Property was acquired and did not intend to gift an interest to Enzo by placing his name on record title. Sarah's subsequent acts confirm that Sarah did not intend to gift any interest in the Property to Enzo.

**Inequitable conduct**

Trustee argues that the imposition of a resulting trust is equitable in nature and should not be employed where Sarah deliberately falsified evidence and deliberately failed to search for evidence depriving Trustee of a fair trial. As noted in Part II.A., above, Sarah's alteration of evidence did not prevent Trustee from having a fair

trial. Imposing a resulting trust in this case is not inequitable.

Trustee asserts that Sarah failed to make a reasonable search for documents and failed to produce numerous relevant documents and neither Trustee nor the Court can determine whether Sarah destroyed relevant documents or withheld relevant documents. The Court does not find Trustee's bald allegations that there must be undisclosed documents not produced by Sarah persuasive. Trustee asserts that Sarah must have records in locations other than the Property, but that is pure conjecture on Trustee's part and is emphatically rejected by Sarah's testimony. Ms. Korb's testimony supports Sarah's testimony that all documents responsive to Trustee's discovery requests were produced. There is no evidence that Sarah concealed documents, and there is no evidence of inequitable conduct.

### C. Impact of Subsequent Acts on the Resulting Trust

Having established that Sarah is entitled to a resulting trust on the Property as of the date the Property was purchased, the question is whether there are any subsequent acts that extinguish Sarah's claim to a resulting trust today. There are three acts raised by the parties that this Court will consider: (i) the 1990 joint loan that repaid the Property purchase money and improvement costs; (ii) Sarah's 1994 transfer of "her community property interest" in the Property into her 1984 living trust; and (iii) the 1998 transfer of the Property into the Cecconi Residential Trust.

 Sarah acknowledges that a resulting trust arising from the purchase of property "can be extinguished by an oral conveyance or surrender of his interest by the beneficiary of the resulting trust to the trustee." *Johnson v. Altman,* 96 Cal. App.2d 467, 469, 215 P.2d 768 (1950).

However, Sarah asserts that the resulting trust has not been extinguished by any of her actions.

### 1. 1990 Joint Mortgage

█ Trustee argues that Sarah extinguished the purchase money resulting trust by obtaining a mortgage that reimbursed Sarah for the purchase money she paid in 1985 and substituted Sarah's separate property collateral for a joint obligation secured by community property. Trustee acknowledges that there is no case directly on point regarding the mortgage issue and relies on *Gudelj v. Gudelj*, 41 Cal.2d 202, 259 P.2d 656 (1953), to support this argument.

In *Gudelj*, the divorcing parties disagreed on how much separate property was used to acquire property that was the subject of a resulting trust. The *Gudelj* court set forth the following guiding principles:

> "[F]unds procured by the hypothecation of separate property of a spouse are separate property of that spouse." . . . The proceeds of a loan made on the credit of separate property are governed by the same rule. . . . In accordance with this general principle, the character of property acquired by a sale upon credit is determined according to the intent of the seller to rely upon the separate property of the purchaser or upon a community asset.

*Gudelj*, 41 Cal.2d at 210, 259 P.2d 656 (citations omitted).

Here the evidence shows that only Sarah's financial statements were used to obtain the joint mortgage. Enzo's financial statements were not used to obtain the mortgage. Simply because Enzo's name was on legal title to the Property does not mean that the Property was community property. Under *Gudelj*, credit extended on Sarah's separate property would remain her separate property. *Gudelj*, 41 Cal.2d at 210, 259 P.2d 656.

This analysis is supported by *Novak v. Novak*, 249 Cal.App.2d 438, 57 Cal.Rptr. 564 (1967). In *Novak*, a father quitclaimed title to his property to his son and daughter-in-law in order to permit the son and daughter-in-law to obtain a loan on the property to prevent foreclosure. The father continued to reside in the property, paid all of the loan payments and taxes, and improved the property. Once the loan was paid in full, the father did not make any rental payments. When the loan was paid in full, the father sought to have title reconveyed to him and the son and daughter-in-law refused. In an action to quiet title, the *Novak* court held that the son and daughter-in-law held the property in a resulting trust for the father, stating that the existence of a resulting trust is not "prevented because the transferee of title assumes an obligation to pay." *Novak*, 249 Cal.App.2d at 442, 57 Cal.Rptr. 564 (citation omitted). Moreover, "the individual claiming a beneficial interest in the property need not have made an express promise to repay the loan; his promise may be implied from the circumstances in which event the trustee of the resulting trust holds legal title merely as security for the repayment of the loan." *Id.*

Under *Novak*, Enzo's signature on the joint mortgage does not prevent the existence of a resulting trust. Sarah paid the initial purchase money and all of the Property development costs from her separate funds. While the joint mortgage did reimburse Sarah for those funds, Sarah merely exchanged her separate funds for a mortgage which Sarah repaid from her own funds. There is no evidence that Enzo reimbursed Sarah for any of her separate funds expended on the Property. Enzo did not reimburse Sarah for any part of her full beneficial interest by signing the

joint mortgage, so the joint mortgage did not terminate Sarah's resulting trust in the Property.

### 2. 1994 Transfer into Sarah's Living Trust

 Trustee argues that Sarah—with the assistance of counsel—transmuted the Property to community property in 1994 when Sarah transferred her interest in the Property into her living trust. As discussed in more detail in Section II.3.b.ii, below, under California law, a writing signed by Sarah does not transmute the character or ownership of property unless the writing contains an "express declaration" which states expressly that the ownership or characterization of the affected property is being changed. The May 1994 Grant Deed provides in relevant part:

> SARAH COLEMAN CECCONI, as to her community property interest hereby GRANT(S) to SARAH C. CECCONI, Trustee of The SARAH C. CECCONI LIVING TRUST established March 27, 1984, and all Amendments and Restatements thereto

There is no indication in the language of the May 1994 Grant Deed that Sarah's asserted full beneficial interest in the Property is being altered or that Enzo's interest as trustee of a resulting trust is being altered. Thus, the May 1994 Grant Deed does not transmute Sarah's full beneficial interest in the Property.

### 3. Cecconi Residential Trust

Trustee asserts that when Sarah signed the Cecconi Residential Trust that act either eliminated any resulting trust by (a) placing the Property into an express trust or (b) transmuted the Property into community property.

### a. Placing the Property into an Express Trust

 Citing *Bayles v. Baxter*, 22 Cal. 575, 579–80 (1863), Trustee argues that a resulting trust cannot arise where the parties have entered into an express trust concerning the same property. In *Bayles*, plaintiffs furnished money to defendant to purchase an interest in a mining company. Defendant was to hold the interest in defendant's name until a meeting of the company two months later. When plaintiffs requested defendant return their interests in the company, defendant refused. Defendant argued that since plaintiffs expressly told defendant how to hold the property, an express trust was created and there could be no resulting trust.

The *Bayles* court held that a purchase money resulting trust arose since defendant took the property in his own name when the consideration money had been furnished by plaintiffs. "A resulting trust is the mere creature of equity ... and it cannot therefore arise where there is an express trust declared by the parties, *and evidenced by a written declaration of such express trust.*" *Bayles*, 22 Cal. at 579–80 (emphasis in original). *Bayles* further holds that "a resulting trust may be proved by parol and also defeated by parol proof of an agreement to a different trust from that which would be implied by law...." *Bayles*, 22 Cal. at 580.

Here, as explained in greater detail in Section II.3.b.ii, below, there is no evidence that Sarah's execution of the Cecconi Residential Trust "is an agreement to a different trust from what would be implied by law." The evidence shows that Enzo held the Property as a purchase money resulting trust for Sarah's benefit prior to the execution of the Cecconi Residential Trust and Sarah's execution of the Cecconi Residential Trust did not transmute Sa-

rah's full beneficial interest in the Property.

Trustee also argues that the transfer of trust property at the direction of the trust beneficiary terminates a resulting trust. W. Fratcher, *Scott on Trusts* § 410 (4th ed.1989). *Lowenthal v. Kunz,* 104 Cal. App.2d 181, 231 P.2d 62 (1951) illustrates this general rule.

In *Lowenthal,* defendant and decedent were business partners and acquired property as tenants in common in 1924. In 1932, decedent conveyed her interest in the property to defendant with the oral agreement that defendant hold the property in trust for decedent. In 1943, decedent requested that defendant execute a joint tenancy deed to the property with a right of survivorship. Upon decedent's death, decedent's estate administrator asserted an undivided one-half interest in the property pursuant to the 1932 oral agreement. The *Lowenthal* court held that the 1943 request by decedent to execute the joint tenancy deed terminated the prior 1932 oral agreement. *Lowenthal,* 104 Cal. App.2d at 184, 231 P.2d 62. Based on the express oral request of the decedent, the prior oral trust was terminated. *Id.*

Here, as discussed in more detail in Section II.3.b.ii, below, Sarah did not alter her full beneficial interest in the Property upon her execution of the Cecconi Residential Trust. There is no evidence that Sarah gifted any part of her full beneficial interest in the Property to Enzo in executing the Cecconi Residential Trust. Because Sarah's execution of the Cecconi Residential Trust did not extinguish the purchase money resulting trust held by Enzo, there is no surrender of Sarah's beneficial interest to Enzo and no termination of the purchase money resulting trust.

### b. Transmutation of the Cecconi Residential Trust

There are two issues regarding transmutation. The first question is whether California law precludes this Court from using the Cecconi Residential Trust as evidence of a transmutation. If the Cecconi Residential Trust is such evidence, the second question is whether the trust document alters the way the Property is held.

### i. California Family Code Section 853

California Family Code sections 850 to 853 govern the transmutation of property under California law. In particular, California Family Code section 853(a) ("Section 853") precludes the admission of statements in a will as evidence of a transmutation.[18] Sarah argues that the Residential Trust is equivalent to a testamentary document and Section 853 precludes its use to transmute the Property. Section 853 provides:

> (a) A statement in a will of the character of property is not admissible as evidence of a transmutation of the property in a proceeding commenced before the death of the person who made the will.

In *Estate of Gallio,* 33 Cal.App.4th 592, 39 Cal.Rptr.2d 470 (1995), the California Court of Appeals held that under Section 853, the will of a living stepmother could not be used as evidence in the probate

---

**18.** Sarah asserts—and Trustee does not dispute—that this state evidence rule should be applied by this Court since Section 853 is a substantive rule and applicable under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Feldman v. Allstate Ins. Co.,* 322 F.3d 660 (9th Cir.2003) (in a federal diversity case involving state law cause of action for breach of the implied covenant of good faith and fair dealing, evidence of taped conversations that would be admissible under federal rules but not admissible under California evidence rules were not admissible since the evidence rules were intimately bound up with the state substantive law).

proceeding of her husband to show the transmutation of property. The *Gallio* court stated that

> The rationale for [Section 853] is as follows: Such testamentary statements are typically made for purposes of tax planning and disposition at death. They are not intended to convey a *present interest* in the property. Further, a will is ambulatory in nature, subject to revocation or modification during the testator's life; it 'speaks' only as of the date of the testator's death.

*Gallio*, 33 Cal.App.4th at 598, 39 Cal. Rptr.2d 470 (emphasis in original; citations omitted). Sarah recognizes that no California case has analyzed Section 853 in the context of a revocable trust. Sarah asserts, however, that the rationale behind Section 853 should apply to a revocable trust and this Court should preclude the use of the Cecconi Residential Trust to prove a transmutation.

 Trustee argues that the Cecconi Residential Trust is not a will under California law and that there is no basis for this Court to expand the language of Section 853 to apply to the Cecconi Residential Trust. "The essential characteristic of an instrument testamentary in its nature is, that it operates only upon and by reason of the death of the maker. Up to that time it is ambulatory." *Nichols v. Emery*, 109 Cal. 323, 329, 41 P. 1089 (1895). In executing a will, the testator does not part with any rights or any part of his or her estate, and no rights have accrued to anyone else. *Id.*

 In contrast, a valid trust is created when some estate or interest in property is conveyed to the trustee and that interest passes to the trustee immediately. An instrument that makes a present transfer of an interest in property is not a will:

> An instrument is declared to be testamentary in nature only when, and be-

cause, it appears from its terms that the intention of the maker thereof was that it should not be operative as a conveyance or disposition of the property, or of any interest, present or future, therein, until his death. This is always essential. If the instrument, according to proper legal effect under the rules of conveyancing, passes at the time of its execution a present interest or title in the property to a third person, although it may be only an interest in a future estate and may be subject to defeat on the happening or nonoccurrence of a future event, it is a present conveyance and not a will.

*Tennant v. John Tennant Memorial Home*, 167 Cal. 570, 579, 140 P. 242 (1914). *Accord Belshe v. Hope*, 33 Cal.App.4th 161, 38 Cal.Rptr.2d 917 (1995)(quoting *Tennant* and holding that a trust that transfers a present interest at its creation and where the grantor reserves power of revocation without invalidating the trust is a valid trust and is not a testamentary document).

 The Court agrees with Trustee that Section 853 applies only to wills and there is no basis for applying that section to the Cecconi Residential Trust. First, "[i]t is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (citations omitted). The language of Section 853 says "[a] statement in a will" and does not have any language including will-substitutes. The statutory language is plain and construing Section 853 to apply only to wills is not an absurd reading of that statute.

 Second, as stated in *Gallio*, the reason a statement in a will is excluded as

evidence of transmutation is because testamentary statements do not convey a present interest in property. A will is "ambulatory" in nature and does not "speak" until the date of the testator's death. *Gallio*, 33 Cal.App.4th at 598, 39 Cal.Rptr.2d 470. A trust is very different in nature from a will in that a trust conveys an interest at the time of its making. California case law—as set forth in *Nichols* and *Tennant* above—holds that instruments that convey a present interest are not wills. Section 853 does not apply to the Cecconi Residential Trust and that instrument is admissible as evidence of transmutation.

### ii. Transmutation under California Family Code Section 852(a)

Even if the Cecconi Residential Trust is admissible, Sarah argues that the Cecconi Residential Trust does not adhere to strict statutory formalities required by California Family Code Section 852(a) ("Section 852(a)") and does not transmute the Property. Section 852(a) provides:

> A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.

The seminal case interpreting Section 852(a) is *Estate of MacDonald*, 51 Cal.3d 262, 272 Cal.Rptr. 153, 794 P.2d 911 (1990), where the California Supreme Court held that a writing signed by the adversely affected spouse is not an "express declaration" for the purposes of Section 852(a) unless it contains language which expressly states that the characterization or ownership of the property is being changed. *MacDonald* involved a second marriage

for both the husband and the wife. The husband and the wife intended to leave their own property to their own children. The husband received a $266,557.90 distribution from a pension plan in which the wife possessed a community property interest. The wife signed distribution papers consenting to the distribution of the funds into IRA accounts held solely in the husband's name. The wife was diagnosed with cancer and died. The wife's executrix sued for a determination of the wife's community property interest in the IRA accounts.

The California Supreme Court, interpreting California Civil Code § 5110.730(a),[19] the predecessor of Section 852(a), noted that the term "express declaration" was unclear and ambiguous, and analyzed legislative intent to determine how to construe the term. *MacDonald*, 51 Cal.3d at 268, 272 Cal.Rptr. 153, 794 P.2d 911. The *MacDonald* court noted that "it seems reasonable to assume that the Legislature intended section 5110.730(a) to invalidate some claimed transmutations even though some form of writing existed." *Id.* at 270, 272 Cal.Rptr. 153, 794 P.2d 911. The court then went on to fashion a test "by which courts may judge the adequacy of particular writings for section 5110.730(a) purposes." *Id.*

First, the *MacDonald* court refused to allow parol evidence to supplement the words of the written agreement. *MacDonald*, 51 Cal.3d at 272, 272 Cal.Rptr. 153, 794 P.2d 911. Then the court concluded that "a writing signed by the adversely affected spouse is not an 'express declaration' for the purposes of section 5110.730(a) *unless* it contains language which expressly states that the character-

---

**19.** California Family Code § 852 continues former California Civil Code § 5110.730 without change.

ization or ownership of the property is being changed." *Id.* (emphasis in original). Under the facts before it, the *MacDonald* court found that the consent paragraph transferring the IRA funds into an account solely in the husband's name did not expressly state that the wife was effecting a change in the character or ownership of her interest. The *MacDonald* court stated:

> It is not possible to tell from the face of the consent paragraphs, or even from the face of the adoption agreements as a whole, whether decedent was aware that the legal effect of her signature might be to alter the character or ownership of her interest in the pension funds. There is certainly no language in the consent paragraphs, or the adoption agreements as a whole, expressly stating that decedent was effecting a change in the character or ownership of her interest.

*Id.* at 272–73, 272 Cal.Rptr. 153, 794 P.2d 911. The court further stated that an express declaration need not expressly state "transmutation" and "the paragraph signed by decedent here would have been sufficient if it had included an additional sentence reading: 'I give to the account holder any interest I have in the funds deposited into this account.'" *Id.* at 273, 272 Cal.Rptr. 153, 794 P.2d 911.

 Trustee argues that the Cecconi Residential Trust transmuted the Property into community property because the recitals declare that the Property is community property. Recital A of the Cecconi Residential Trust states in relevant part: [20]

The trust estate will initially consist of the Settlors' principal residence located at 3190 Del Ciervo Road in Pebble Beach, California, together with any tangible personalty that is the Settlors' community property located therein. The Settlors declare that any property held by them as joint tenancy prior to its transfer into the trust is in fact community property and, furthermore, that all property listed on Schedule A [description of the Property] is the community property of the parties.

The question is whether the statement "[t]he Settlors declare ... that all property listed on schedule A [description of the Property] is the community property of the parties" in the Cecconi Residential Trust constitutes an "express declaration" under Section 852(a). This Court finds that there is no such express declaration in the Cecconi Residential Trust.

Under *MacDonald,* an express declaration "contains language which expressly states that the characterization or ownership of the property is being changed." *MacDonald,* 51 Cal.3d at 272, 272 Cal. Rptr. 153, 794 P.2d 911. The statement in the recitals of the Cecconi Residential Trust does not expressly state that Sarah is effecting a change in the character or ownership of her interest in the Property. Moreover, just as the *MacDonald* court found there was no express declaration where "[i]t is not possible to tell from the face of the consent paragraphs, or even from the face of the adoption agreements as a whole, whether decedent was aware that the legal effect of her signature might be to alter the character or ownership of

---

**20.** Sarah asks this Court to consider Sarah's testimony in determining Sarah's intent in executing the Cecconi Residential Trust. However, "[t]he determination whether the language of a writing purporting to transmute property under the *MacDonald* test must be made by reference to the writing itself, with-

out resort to parol evidence." *In re Marriage of Barneson,* 69 Cal.App.4th 583, 588, 81 Cal. Rptr.2d 726 (1999). This Court will look only to the Cecconi Residential Trust to determine whether that document transmutes the Property.

her interest in the pension funds," *Mac-Donald,* 51 Cal.3d at 272–73, 272 Cal.Rptr. 153, 794 P.2d 911, here it is not possible to tell from the recitals to, or the entire Cecconi Residential Trust as a whole, that Sarah was aware that the legal effect of her signature might be to alter the character or ownership of her beneficial interest in the Property. This analysis is consistent with subsequent case law applying *MacDonald.*

In *In re Marriage of Barneson,* 69 Cal. App.4th 583, 81 Cal.Rptr.2d 726 (1999), the husband had a stroke and, one year after the stroke, the husband's separate property stock was transferred into the name of the wife. After the husband transferred the stock, the husband filed for dissolution and the wife asserted that the stock was transmuted into her separate property. The *Barneson* court stated that: "The California Supreme Court, in *MacDonald,* interpreted the 'express declaration' provision of the identically worded predecessor to [Section 852(a)], as requiring language which expressly states that a change in the characterization or ownership of the property is being made." *Barneson,* 69 Cal. App.4th at 588, 81 Cal.Rptr.2d 726. The California Court of Appeals further noted that "[a] transmutation may be effected by means of a transfer, but a transfer is not necessarily a transmutation." *Id.* at 591, 81 Cal.Rptr.2d 726. "*MacDonald's* interpretation of the 'express declaration' language in [Section 852(a) ], can be viewed as effectively creating a 'presumption' that transactions between spouses are not 'transmutations,' rebuttable by evidence the transaction was documented with a writing containing the requisite language." *Id.* at 593, 81 Cal.Rptr.2d 726. In *Barneson,* nothing in the transfer directions expressly stated that the characterization or ownership of the property was being changed, and the stock remained the separate property of the husband. The *Barne-*

*son* court reasoned that the husband may simply have intended to transfer management of the property to his wife to enable her to more easily manage his financial affairs for him after his stroke without changing the ownership or characterization of the property.

Just as in *Barneson,* simply because there was a transfer of the Property into the Cecconi Residential Trust does not mean that transfer effectuated a transmutation. Under the *Barneson* "presumption" that "transactions between spouses are not 'transmutations,' rebuttable by evidence the transaction was documented with a writing containing the requisite language," *Barneson,* 69 Cal.App.4th at 593, 81 Cal.Rptr.2d 726, it is presumed that the Cecconi Residential Trust is not a transmutation, especially since the recitals do not contain any statement or indication that Sarah was aware that the legal effect of her signature might be to alter the character or ownership of her beneficial interest in the Property.

In *Estate of Bibb,* 87 Cal.App.4th 461, 104 Cal.Rptr.2d 415 (2001), the California Court of Appeals held that a grant deed conveying a husband's separate property to himself and his wife as joint tenants was a sufficient expression of a husband's intent to transmute his separate property into joint tenancy. In *Bibb,* the husband owned an apartment building as separate property prior to his second marriage. After that marriage, the husband wanted to borrow funds to renovate the building and signed a grant deed conveying title to himself and his second wife as joint tenants to enable the husband to obtain a loan. The husband had a stroke the next month and died intestate seven months later. The husband's son claimed that the apartment building was part of the probate estate. The California Court of Appeals held that the grant deed transferring title

to joint tenancy transmuted the property stating that: "since 'grant' is the historically operative word for transferring interests in real property, there is no doubt that Everett's use of the word 'grant' to convey the real property into joint tenancy satisfied the express declaration requirement of [Section 852(a) ]." *Bibb*, 87 Cal. App.4th at 468–69, 104 Cal.Rptr.2d 415 (citation omitted).

Trustee argues that the April 1998 Grant Deed transferring the Property to Enzo and Sarah as co-trustees of the Cecconi Residential Trust is a valid transmutation under *Bibb* and grants an interest in the Property to the Cecconi Residential Trust as the community property of the settlors. The Court disagrees. In *Bibb*, the husband signed a grant deed that transferred his separate property interest in an apartment building to a joint tenancy interest. There was a clear shift in the nature of the husband's property interest. Here, as this Court has already found, the Cecconi Residential Trust did not alter how Enzo and Sarah held the Property. The recitals in the Cecconi Residential Trust do not contain any statement or indication that Sarah was aware that the legal effect of her signature might be to alter the character or ownership of her beneficial interest in the Property. Thus, unlike *Bibb*, there is no obvious indication that grant deed altered how the Property was held when Enzo and Sarah transferred the Property to themselves as co-trustees of the Cecconi Residential Trust in the April 1998 Grant Deed, and therefore there is no transmutation.

The most recent case analyzing what constitutes express intent under Section 852(a) is *In re Marriage of Starkman*, 129 Cal.App.4th 659, 28 Cal.Rptr.3d 639 (2005). In *Starkman*, the husband owned significant separate property that was transferred into a revocable trust during the

marriage as part of the couple's estate planning. The husband transferred his separate property into the trust without stating that the property retained its separate nature. The relevant portion of the trust agreement provided: "Settlors agree that any property transferred by either of them to the Trust … is the community property of both of them unless such property is identified as the separate property of either Settlor." *Starkman*, 129 Cal. App.4th at 662, 28 Cal.Rptr.3d 639. Contemporaneously with the execution of the trust, the husband and wife executed a general assignment which did not specifically exclude any property as separate property of either spouse. The general assignment conveyed "any asset, whether real, personal, or mixed … [they] now own or which we may own in the future." *Id.* Upon the dissolution of the marriage, the husband revoked the trust and the wife asserted that the stock transferred to the trust transmuted the separate property of the husband to community property.

The California Court of Appeals in *Starkman* determined that the trust agreement did not intend to transmute the property and the stocks remained the separate property of the husband, stating:

> [The Trust's] purpose is not an agreement between [wife] and [husband] to transmute the entirety of [husband's] substantial separate property assets into community property. Neither the sentence in Paragraph 2.03 upon which [wife] relies, nor the conveyance to the Trust effected by the General Assignment … unambiguously establishes that [husband] was effecting a change of ownership in the entirety of his significant separate estate.

*Starkman*, 129 Cal.App.4th at 664–65, 28 Cal.Rptr.3d 639. "The express declaration must unambiguously indicate a change in character or ownership of property. A

party does not 'slip into a transmutation by accident.'" *Id.* at 664, 28 Cal.Rptr.3d 639 (citation omitted).

Trustee asserts that *Starkman* does not support Sarah's contention that there was no transmutation because, unlike the trust document in *Starkman* that did not identify specific property, the Cecconi Residential Trust specifically identifies the Property and expressly declares that all property held in joint tenancy by the Cecconis prior to the transfer into the trust is community property and the Cecconi Residential Trust does not refer to any separate property of either spouse. The Court disagrees. *MacDonald* provides that a transmutation can occur only where there is an express declaration that clearly indicates that the adversely affected party was aware that the legal effect of his or her signature might be to alter the character or ownership of his or her interest in the affected property. *MacDonald*, 51 Cal.3d at 272, 272 Cal.Rptr. 153, 794 P.2d 911. There is no clear showing in the Cecconi Residential Trust that Sarah was aware that by her signing that document, she was legally altering the character or ownership of her beneficial interest in the Property. *Starkman* does not alter this analysis. In fact the *Starkman* court specifically stated that: "The express declaration must unambiguously indicate a change in character or ownership of property. A party does not 'slip into a transmutation by accident.'" *Starkman*, 129 Cal.App.4th at 664, 28 Cal.Rptr.3d 639 (citation omitted). Trustee would have Sarah "slip into transmutation by accident," and that is contrary to established law.

Trustee also relies on *Finalco, Inc. v. Roosevelt*, 87 F.3d 311 (9th Cir.1996), to support his argument that the when the Cecconi Residential Trust expressly declares the Property to be community property, that statement satisfies the "express declaration" requirement of Section 852(a). In *Finalco*, the Ninth Circuit found that the language contained in a marital agreement—executed when the parties were having marital difficulties—satisfied the "express declaration" requirement of Section 852(a) because:

> Paragraphs 5(a) and 5(b) of the Agreement stated that both Steven and Judy had an interest in the Glendora property. Section 7(b) then provided:
>> STEVEN and JUDY agree that *all property set forth in Exhibit D* and any property hereafter acquired by JUDY during the marriage by any means including but not limited to purchase, gift, bequest, devise, or descent *shall be* and remain *her separate property.*
>
> Marital Agreement, ¶ 7(b) (emphasis in original). Exhibit D listed the Glendora property. Thus, the Agreement acknowledged that Steven had an interest in the Glendora property and then declared the property to be Judy's separate property. The Agreement "contains language expressly stating that the ownership of the property is being changed" and therefore was a valid transfer of the Glendora property as between Steven and Judy.

*Finalco*, 87 F.3d at 315. In *Finalco*, the marital agreement stated specifically that both parties held an interest in the subject property and, in a later section of that agreement, the parties specifically acknowledged that the property was to be the separate property of the ex-wife. The marital agreement in *Finalco* clearly transmuted that property. Here, there is no express declaration of Sarah's—the adversely affected party—full beneficial interest in the Property and then a subsequent declaration that alters that interest, as required by *MacDonald*. *Finalco* does not alter this Court's analysis that the

Cecconi Residential Trust did not transmute Sarah's full beneficial interest in the Property.

### III.

### *CONCLUSION*

For the reasons set forth above, this Court finds that Enzo holds no beneficial interest in the Property. The Property is Sarah's sole and separate property. Accordingly, Trustee has no interest in the Property. Counsel for Sarah shall prepare a form of judgment and submit it to the Court, after review by counsel for Trustee and Enzo.

Regarding Trustee's request for monetary sanctions, Trustee shall set for hearing his request for a specific amount of fees, giving Sarah an opportunity to object to the fee request and Trustee an opportunity to reply.